In the Matter of the ESTATE OF Constance Louise FOSLER, Deceased:

Daniel D. Fosler and his heirs, Appellants (Respondents),

v.

William J. Collins, Personal Representative, Appellee (Petitioner),

and

Richard O. Puthoff, Appellee.

No. 00–55.

Supreme Court of Wyoming.

Nov. 30, 2000.

Representing Appellants: Thomas N. Long of Thomas N. Long, P.C., Cheyenne, WY.

Representing Appellee Collins: No appearance.

Representing Appellee Puthoff: Gregory C. Dyekman and Kristen J. Schlattmann of Dray, Thomson & Dyekman, P.C., Cheyenne, WY.

Before LEHMAN, C.J., and THOMAS, GOLDEN, HILL and KITE, JJ.

KITE, Justice.

Constance Louise Fosler died intestate leaving a significant estate. Her only surviving relatives were first cousins and their descendants. The personal representative asked the district court to determine the method for distributing the assets to the collateral heirs and to issue an order for partial distribution. The district court construed the controlling statute, Wyo.Stat.Ann. § 2–4–101(c)(iii) (LEXIS 1999), to require distribution to the nearest living generation (the first cousins) as the root generation per capita and to their descendants per stirpes. It is from this decision that Daniel D. Fosler,[1] a first cousin, and his heirs appeal. Mr. Folser asserts the appropriate distribution is to the root generation comprised of the deceased grandfather, grandmother, uncles, and aunts per capita and then to their descendants per stirpes. We reverse and remand to the district court with the direction that the distribution be made to the root generation comprised of the deceased grandfather, grandmother, uncles, and aunts per capita and then to their descendants per stirpes.

## ISSUES

Mr. Fosler presents the following issue for our review:

How is Wyo.Stat. § 2–4–101(c)(iii) to be applied to the distribution of assets of a decedent whose next of kin are the descendants of aunts and uncles?

Richard Puthoff[2] rephrases the issue as follows:

I. In its Order for Partial Distribution dated January 4, 2000, the District Court properly determined that, pursuant to Wyo.Stat. § 2–4–101(c)(iii), the root generation to which the initial distribution of the estate of Constance Louise Fosler should be made is the first generation in which there are living heirs.

## FACTS

There are no facts in dispute, and no evidentiary proceedings were held. Ms. Fosler died intestate in Casper on December 23, 1998, leaving an estate in excess of $19,000,-000. At the time of her death, no children, grandchildren, or other lineal descendants survived her. A personal representative was appointed on January 5, 1999, to administer the estate. Through the use of a genealogical search service, the personal representative identified one living first cousin—Mr. Fosler—and his descendants on the paternal side and six living first cousins and their descendants on the maternal side.[3] In all, twenty-six collateral relatives were identified by the search. On October 18, 1999, the personal representative filed a petition for partial distribution requesting that the court determine the appropriate method of distri-

---

1. The appellants are Mr. Fosler and his heirs. For clarity, the appellants shall be referred to collectively by reference to Mr. Fosler.

2. The appellees are the personal representative and Mr. Puthoff. The personal representative did not file a brief or appear at oral arguments. Mr. Puthoff is Ms. Fosler's first cousin and, therefore, an heir who will take a portion of the estate.

3. Mr. Puthoff asserts that the use of the terms "second" and "third" cousins in the district court proceedings was error. He contends the appropriate descriptions are "first cousins once removed" and "first cousins twice removed." For the purposes of this decision, we will utilize the descriptor "first cousins and their descendants."

bution to the collateral heirs. In the memorandum of law, the personal representative set out four possible methods of distribution referred to as 1(a), 1(b), 2(a) and 2(b). Method 1(a) used the statutorily named generation—grandfather, grandmother, uncles, and aunts—as the root[4] generation. Because the aunts and uncles would take per stirpes from the grandparents, the grandparents are ignored. The aunts and uncles form the root generation and would take per capita,[5] and their descendants would take per stirpes. Method 1(b) did not ignore the grandparents and used "grandfather, grandmother, uncles, aunts"[6] as the root generation with each member taking per capita and their descendants taking per stirpes. Method 2(a) used the first generation with living members—the first cousins in this case—as the root generation who would take per capita, and their descendants would take per stirpes. Finally, Method 2(b) used a per capita distribution to all living heirs.[7] Mr. Fosler filed a response on November 17, 1999, in which he urged the district court to adopt Method 1(b). A hearing was held on November 18, 1999.[8] The district court issued a decision letter selecting Method 2(a) (the first cousins as the root generation taking per capita, and their descendants taking per stirpes), and Mr. Fosler filed a motion for reconsideration. A second hearing was held on December 15, 1999. On January 4, 2000, the district court issued an order denying the motion for reconsideration and a separate order for partial distribution which required distribution in keeping with Method 2(a). Mr. Fosler filed his notice of appeal from these orders.

## STANDARD OF REVIEW

The issue to be addressed is whether the district court properly applied § 2–4–101(c)(iii) in selecting the first generation with living members as the root generation

to take per capita, with their descendants to take per stirpes (Method 2(a)). "The question is one of statutory interpretation. Statutory interpretation is a question of law; therefore, our standard of review is *de novo.*" *Anderson Highway Signs and Supply, Inc. v. Close,* 6 P.3d 123, 124 (Wyo.2000). As we have noted:

> "In interpreting statutes, we primarily determine the legislature's intent. If the language is sufficiently clear, we do not resort to rules of construction. We apply our general rule that we look to the ordinary and obvious meaning of a statute when the language is unambiguous."

*Thunderbasin Land, Livestock & Investment Co. v. County of Laramie County,* 5 P.3d 774, 779 (Wyo.2000) (quoting *Kirbens v. Wyoming State Board of Medicine,* 992 P.2d 1056, 1060 (Wyo.1999) (citations omitted)). We construe together all parts of the statutes in pari materia, and, in ascertaining the meaning of a given law, we consider and construe in harmony all statutes relating to the same subject or having the same general purpose. *Id.*

> When the language is not clear or is ambiguous, the court must look to the mischief the statute was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conclusions of law, and other prior and contemporaneous facts and circumstances, making use of the accepted rules of construction to ascertain a legislative intent that is reasonable and consistent.

*State ex rel. Motor Vehicle Division v. Holtz,* 674 P.2d 732, 736 (Wyo.1983). When the legislature adopts a statute, we presume it did so with full knowledge of the existing state of the law with reference to the stat-

---

4. Per stirpes is defined as: "Proportionally divided between beneficiaries according to their deceased ancestor's share." Black's Law Dictionary 1164 (7th ed.1999). The terms "root" and "stock" are used interchangeably by various authorities.

5. Per capita division means: "Divided equally among all individuals." Black's Law Dictionary 1156 (7th ed.1999).

6. Section 2–4–101(c)(iii).

7. The four methods would result in the following aggregate distribution percentages to Mr. Fosler: 1(a)—11.1111%; 1(b)—12.8205%; 2(a)—6.25%; and 2(b)—3.8462%.

8. The record does not contain a transcript of the November 18, 1999, hearing.

ute's subject matter. *Thunderbasin Land, Livestock & Investment Co.,* 5 P.3d at 780.

All statutes are presumed to be enacted by the legislature with full knowledge of the existing state of law with reference thereto and statutes are therefore to be construed in harmony with the existing law, and as a part of an overall and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to the decisions of the courts.

*Voss v. Ralston,* 550 P.2d 481, 486 (Wyo. 1976).

## DISCUSSION

In drafting intestate laws, legislatures have tried ... to provide for a scheme of distribution that would likely coincide with the desires of the average man who owns an average size estate composed of ordinary property to be distributed among a usual number and kind of relatives who are of equal need and friendly toward each other.

1 William J. Bowe & Douglas H. Parker, Page on the Law of Wills § 1.6 at 20 (1960); *see also* Lawrence H. Averill, Jr., *Wyoming's Law of Decedents' Estates, Guardianship and Trusts: A Comparison with the Uniform Probate Code—Part I,* VII Land & Water L.Rev. 169, 176 (1972). When a person dies without a will (or other estate planning instrument) that explains the manner in which the estate is to be divided among relatives and friends, the intestacy statutes provide a default plan. These provisions have often been criticized as being imperfect and unfair. Among the fifty states, the stat-

utes are widely disparate, and many of the provisions were drafted over one hundred years ago.[9] There have been significant changes in the organization of families and communities in this passage of time marked by the transition from primarily agrarian to predominately urban lifestyles. This has consequently led to the fragmentation of family ties and the concept of kinship. Although it was once true that extended families often lived their entire lives in the same small community or in relatively close proximity to one another, it is not the usual case today. In addition, the population has been aging and has become more mobile, thus changing family dynamics.[10]

Efforts have been made to reform probate codes and to address these societal changes and the perceived inequities of descent to extremely remote relations.[11] These have been primarily changes to ensure per capita distribution to relations of the same degree and restrictions on the inheritance rights of very distant relatives. In this vein, a majority of jurisdictions have selected the generation nearest in degree of relationship to the intestate of which a member is living as the generation from which the stocks will be selected.[12] The policy consideration behind this move is an effort to better effect what is considered to be the intention of a contemporary intestate to have his estate descend to known relatives and not be fractionalized among unknown shirt-tail relatives.

■ The construction of § 2–4–101(c)(iii) is a matter of first impression, which is somewhat remarkable as Wyoming's intestacy provisions have remained essentially unchanged since their initial enactment in 1869.[13] This is despite a significant revision

9. Averill, VII Land & Water L.Rev., *supra,* at 170.

10. David F. Cavers, *Change in the American Family and the "Laughing Heir,"* 20 Iowa L.Rev. 203 (1935).

11. *See* Morris R. Massey, Note, *Probable Interpretation of Wyoming Rules of Descent,* 11 Wyoming L.J. 120, 125 (1957); Charles A. Heckman, *The Treatment of Some Traditional Problems of Intestate Succession in the North Dakota Century Code,* 45 N.D. L.Rev. 465 (1969); Averill, VII Land & Water L.Rev., *supra,* at 170; Earl M. Curry, Jr.,

*Intestate Succession and Wills: A Comparative Analysis of Article II of the Uniform Probate Code and the Law of Ohio,* 34 Ohio St. L.J. 114 (1973).

12. Massey, *supra,* at 122.

13. "Wyoming's intestacy provisions were enacted during the first session of the legislative assembly on December 10, 1869.... Other than a minor amendment in 1877 and a little more significant one in 1915, the basic distribution provisions have remained unchanged." Averill, VII Land & Water L.Rev., *supra,* at 172.

of the Probate Code in 1980,[14] which incorporated certain provisions of the Uniform Probate Code.[15] The relevant portions of the statute provide:

(a) Whenever any person having title to any real or personal property having the nature or legal character of real estate or personal estate undisposed of, and not otherwise limited by marriage settlement, dies intestate, the estate shall descend and be distributed in parcenary to his kindred, male and female, subject to the payment of his debts, in the following course and manner:

. . . .

(c) Except in cases above enumerated, the estate of any intestate shall descend and be distributed as follows:

(i) To his children surviving, and the descendents of his children who are dead, the descendents collectively taking the share which their parents would have taken if living;

(ii) If there are no children, nor their descendents, then to his father, mother, brothers and sisters, and to the descendents of brothers and sisters who are dead, the descendents collectively taking the share which their parents would have taken if living, in equal parts;

(iii) If there are no children nor their descendents, nor father, mother, brothers, sisters, nor descendents of deceased brothers and sisters, nor husband nor wife, living, *then to the grandfather, grandmother, uncles, aunts and their descendents, the descendents taking collectively, the share of their immediate ancestors, in equal parts.*

Wyo.Stat.Ann. § 2–4–101 (LEXIS 1999) (emphasis added).

To resolve this case, we must determine the meaning of the phrase "then to the grandfather, grandmother, uncles, aunts and their descendents, the descendents taking collectively, the share of their immediate ancestors, in equal parts." In this regard, the case of *Moralee v. Cadwell,* 26 Wyo. 412, 186 P. 499 (1920), although applying a different subsection of what is now § 2–4–101, assists in identification of the root generation and proper application of the phrases "in equal parts" and "the descendents taking collectively, the share of their immediate ancestors." The court examined the provision " '[i]f there be no children, nor their descendents, then to his father, mother, brothers and sisters, *and to the descendents of brothers and sisters who are dead (the descendents, collectively, taking the share their parents would have taken if living,) in equal parts.'* "[16] *Moralee,* 186 P. at 500 (emphasis added). The language is almost identical, except for the use of parentheses, to the current provision of § 2–4–101(c)(ii). Mr. Cadwell's only living heirs were two nephews—sons of his deceased—sister and an adopted nephew—the adopted son of his deceased brother.[17] The district court determined that the adopted nephew was entitled to the same share the deceased brother would have received had he survived the intestate. In holding that the term "descendant" includes an adopted child, this Court affirmed the district court's distribution of one-half of the estate to the adopted nephew and one-half of the estate to the other two nephews. 186 P. at 501. This is relevant to

14. What is now called the Wyoming Probate Code of 1980 originally was enacted as the Wyoming Probate Code of 1979. In 1979 the 45th Wyoming State Legislature enacted Chapter 142 which substantially altered prior Wyoming law. Because of a significant number of technical and substantive problems with that code, the 45th Wyoming State Legislature, in its second session, reenacted a full and substantially amended version.

Lawrence H. Averill, Jr., *The Wyoming Probate Code of 1980: An Analysis and Critique,* XVI Land & Water L.Rev. 103, 105–06 (1981).

15. "The new Code does not alter the basic pattern of intestate succession. The designated ben-

eficiaries and their shares remain the same as under the prior law." Averill, XVI Land & Water L.Rev., *supra,* at 109.

16. Subdivision 2 of § 5727 of the Compiled Statutes of 1910.

17. From the language of the case to the effect that "all of his brothers and sisters died prior to the time of his death," it appears Mr. Cadwell had multiple brothers and sisters. It also appears from the facts that only one deceased sister (two sons) and one deceased brother (an adopted son) had heirs who survived the intestate's death. *Moralee,* 186 P. at 499.

the current matter because the *Moralee* court identified the root generation as the deceased brother and sister with descendants,[18] which were the relations specifically named in the statutory language. The phrase "in equal parts" applied to a per capita division to the root generation. The estate was divided by two—"in equal parts" (per capita) between the two members of the statutorily identified root generation (one-half to the deceased sister and one-half to the deceased brother). The phrase "the descendents, collectively, taking the share their parents would have taken if living" dictated a per stirpes or proportional division to the descendants of the root generation. The descendants of the sister and brother took the shares their parents would have taken if alive, which resulted in the sister's two sons each receiving one-fourth and the brother's adopted son receiving one-half. The result is consistent with the following authority:

> Ordinarily, if the statute contains a provision amounting specifically, or in effect, to a declaration that nephews and nieces shall "stand in the place of" or "represent" or "take the share of" their deceased parent, the devolution to nephews and nieces will occur per stirpes, notwithstanding all brothers and sisters of the intestate had predeceased him.

W.W. Allen, Annotation, *Descent and distribution to nieces and nephews as per stirpes or per capita*, 19 A.L.R.2d 191, 206 (1951).

It has been argued that *Moralee* only represents a determination that adopted children are heirs within the law and is not an acknowledgement of per capita division among the statutorily identified members of the deceased root generation and subsequent per stirpes division among the root generation descendants. However, the language of the holding, "[t]herefore the district court rightly held that William P. Cadwell [the adopted nephew], the defendant in error, was entitled to inherit one-half of the property left by the decedent, William H. Cadwell [the intestate]," is persuasive that the decision confirmed both the inheritance of the adopted nephew *and* the proper distribution to the statutorily identified root generation

per capita and then to their descendants per stirpes. *Moralee*, 186 P. at 501.

Mr. Puthoff argues that *Trustees of University of Wyoming v. Eadie (Gilchrist's Estate,)* 50 Wyo. 153, 58 P.2d 431 (1936), supports distribution to the nearest living generation (the first cousins) as the root generation per capita and to their descendants per stirpes. We disagree. The *Eadie* case involved an individual who died with a will in place leaving an estate of $40,000. 58 P.2d at 435. The testatrix had no children or descendants, and her father, mother, brothers, and sisters were dead. 58 P.2d at 434. The only question before the Court was the meaning of a will provision which read: "To any of my living blood relations, I give one hundred dollars each." 58 P.2d at 433. Four hundred eighty-five people claimed to be "living blood relations," and the district court ordered that each person receive the devised $100. 58 P.2d at 434. This Court limited the term "blood relations" to those relatives who could properly establish they were descendants of the brothers and sisters. Those individuals were to receive $100 each in keeping with the terms of the will. 58 P.2d at 439. Mr. Puthoff contends that the order of distribution required a per capita distribution to the first generation with surviving heirs. It does not. The *Eadie* Court, in an effort to discern the meaning of the ambiguous testate devise to "living blood relations," looked to the intestacy statutes (the same provision applied in *Moralee*) to determine which descendants would have benefited had the testatrix died intestate. It concluded, based on the statutory language "and to the descendents of brothers and sisters who are dead," that only descendants of the brothers and sisters would have been entitled to distribution. Then it ordered distribution to those descendants on the basis of the per capita devise "one hundred dollars each" as set out in the will.

This conclusion is supported by the subsequent decision on a petition for rehearing filed in the same case. *Trustees of University of Wyoming v. Eadie (Gilchrist's Estate,)* 50 Wyo. 153, 60 P.2d 364 (1936). One party

---

18. "and to the descendents of brothers and sisters who are dead." *Moralee*, 186 P. at 500.

requested clarification of who was entitled to participate as a legacy claimant and whether an intervening descendant in the line would intercept the inheritance. This Court said in part:

> We answered the point in the affirmative in the original opinion, and we think clearly so; for, after stating the contention of the trustees to the effect that the money should be distributed per stirpes, we concluded that "the authorities cited leave no room for doubt that we must hold that the blood relatives, in so far as they come within the statute of descent and distribution, take *under the will in question here per capita* and not per stirpes."

60 P.2d at 364 (emphasis added). And said further in the decision:

> If there had been a doubt as to whether the testatrix intended to include such claimant, *we could then have gone to the statute of distribution, and have held that the distribution should be per stirpes.* But the language of the testatrix using the term "any" and "each" precluded such doubt. . . .

60 P.2d at 365 (emphasis added). This language supports the conclusion, pursuant to the statutes of descent and distribution which were in effect in 1911 (*Moralee*), in 1936 (*Eadie*), and which continue to the present, that proper distribution to descendants of the statutorily named root generation is per stirpes.

■ It is left to be determined which persons constitute the statutorily named root generation as set out in § 2–4–101(c)(iii). The statutory language provides for "grandfather, grandmother, uncles, aunts." Mr. Puthoff maintains in this case that the first cousins, as the first generation with surviving members, constitute the root generation. This cannot be the case because neither the word "cousin" nor the word "cousins" appears in the statutory language.

With respect to the manner of taking as per capita or per stirpes, the question is governed ordinarily by statutes prescribing the manner of taking by collateral relatives generally, the terms and provisions of which vary more or less in the different jurisdictions, and it is hardly practicable to make any general statement with respect to the application of such provisions in the case of cousins, other than that, unless it is otherwise provided, *those who take in their own right as the intestate's next of kin ordinarily take per capita, and those who take as representatives of deceased ancestors ordinarily take per stirpes.*

C.R. McCorkle, Annotation, *Descent and distribution to and among cousins*, 54 A.L.R.2d 1009, 1033 (1957) (emphasis added). Absent specific statutory language naming "cousins" to receive as a root generation or as part of those defined as next of kin, the cousins can take only by representation as descendants of the uncles and aunts.

On the other hand, Mr. Fosler contends that the proper root generation is the "grandfather, grandmother, uncles, aunts" (Method 1(b)). We agree with this interpretation because "grandfather, grandmother, uncles, aunts" are specifically named in the statute and therefore must constitute the statutorily named root generation. It is of no consequence to the proper interpretation of the statute that, upon the death of the grandparents, the uncles and aunts take their parents' share per stirpes as descendants. It is merely the effect of the statutory language selected by the legislature. Furthermore, to ignore the "grandfather, grandmother" in the event they predecease the intestate would make the statutory reference in that circumstance meaningless. "We will not construe a statute in a way that renders a portion of the statute meaningless." *US WEST Communications, Inc. v. Wyoming Public Service Commission*, 989 P.2d 616, 619–20 (Wyo.1999); *see also McClellan v. State*, 933 P.2d 461, 465 (Wyo. 1997). The reference to "grandfather, grandmother, uncles, aunts" is not qualified by a requirement that they survive the intestate, and we decline to read such a condition into the statute. "This court has no power to add to, or to substitute, words in the statute. That authority is vested in the legislature, and we will not, nor should we, encroach upon its proper authority." *Longfellow v. State*, 803 P.2d 1383, 1388 (Wyo.1991) (citations omitted); *see also Basin Electric Power Cooperative v. Bowen*, 979 P.2d 503, 509

(Wyo.1999). The legislature, having provided through the preceding provisions of § 2–4–101 for the reasonable distribution of an intestate's estate (through several levels of kindred) ended the designation of root generations in § 2–4–101(c)(iii) at "grandfather, grandmother, uncles, aunts." We conclude, for the language to have meaning, the statutorily mandated root generation must be "grandfather, grandmother, uncles, aunts" regardless of whether they survive the intestate.

■ Based on the facts of this specific case, we hold that the proper distribution of Ms. Fosler's estate pursuant to § 2–4–101(c)(iii) is to the deceased "grandfather, grandmother, uncles, aunts" per capita and to their descendants per stirpes (Method 1(b)). In so holding, we recognize that many state legislatures have adopted intestacy provisions which identify the root generation as the nearest generation with living members. However, our 131–year–old statute and case law do not support such an interpretation. The intestacy statutes represent a good faith effort by the legislature to provide a form of estate distribution when the intestate fails to make such arrangements prior to death. Absent such provisions, the estate would escheat to the state. This case presents the unusual circumstance of an intestate dying without lineal descendants and having a very large estate. These facts magnify the deficiencies of remote intestate succession caused by the intestate's failure to provide for a devise of the estate. Although some may perceive this result as being unfair, others may well conclude that the statute accurately reflects what the majority of people would intend. However, we cannot sua sponte revise the statutes through interpretation to satisfy our individual views of contemporary family ties and equitable distribution. " 'Courts are not at liberty to impose their views of the way things ought to be simply because that's what must have been intended, otherwise no statute, contract or recorded word, no matter how explicit, could be saved from judicial tinkering.' " *Markle v. Williamson*, 518 P.2d 621, 625 (Wyo.1974) (quoting *Kilpatrick v. Superior Court in and for County of Maricopa*, 105 Ariz. 413, 466 P.2d 18, 27 (1970)); *see also Byington v.*

*Fuller*, 587 P.2d 636, 638 (Wyo.1978). It is notable that the parties relied on two Wyoming law review articles which anticipated the conclusion we have reached in this decision and suggested the issues poised by the language of the intestacy statutes are for the legislature to decide. *See* Morris R. Massey, Note, *Probable Interpretation of Wyoming Rules of Descent*, 11 Wyoming L.J. 120 (1957); Averill, VII Land & Water L.Rev., *supra*, at 172.

We reverse and remand to the district court for entry of an order consistent with this decision.