2002 WY 181

**WYODAK RESOURCES DEVELOPMENT CORPORATION,**
Appellant (Petitioner),

v.

**WYOMING DEPARTMENT OF REVENUE,** Appellee
(Respondent).

No. 01–249.

Supreme Court of Wyoming.

Dec. 17, 2002.

---

130

Timothy L. Thomas of Morrill, Thomas, Nooney & Braun, LLP, Rapid City, South Dakota, Representing Appellant.

Hoke MacMillan, Attorney General; Rowena L. Heckert, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General; and Karl D. Anderson, Senior Assistant Attorney General, Representing Appellee.

Before HILL, C.J., and GOLDEN, LEHMAN,* KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] Wyodak Resources Development Corporation (Wyodak) challenged the valuation of coal produced from its mine in Campbell County for the years 1992 through 1995, 1998, and 1999. Most of Wyodak's coal is sold under one long term contract with the joint owners of the nearby Wyodak power plant: Black Hills Corporation (Black Hills)—Wyodak's parent company—and Pa-

* Chief Justice at time of oral argument

cifiCorp. Historically, Wyodak reported the value of the gross product sold to its parent company based upon the price it received under that contract. However, in 1997, Wyodak began claiming that, because the sale to Black Hills was not an arms length transaction, Wyo. Stat. Ann. § 39–14–103(b)(viii) (LexisNexis 2001)[1] provided spot market prices must be used to determine the fair market value of that coal.[2] This approach yielded a lower value resulting in a lower tax obligation. The Wyoming Department of Revenue (DOR) rejected Wyodak's position for years 1992 through 1995 on *res judicata* and other procedural grounds, and, for years 1998 and 1999, DOR determined the statutes did not allow use of spot market prices to determine the value of coal sold under this long term contract. The State Board of Equalization (SBOE) upheld DOR's decision. We affirm in part on somewhat different grounds and reverse in part.

### ISSUES

[¶ 2]  Wyodak presents these issues:

1.  Whether the board erred in holding that petitioner's claim for refund of severance taxes paid for the 1992 coal production year is barred by the doctrines of *res judicata* and claim preclusion.

2.  Whether the board erred in holding that petitioner waived its right to request refunds of severance taxes paid for coal production years 1993, 1994 and 1995 by failing to appeal from the original notices of valuation within 30 days.

3.  Whether the board erred in holding that petitioner is barred by the doctrine of laches from challenging the valuation method used by the department in issuing notices of valuation for coal production years 1992, 1993, 1994 and 1995.

4.  Whether the board erred in upholding the department's position that the non-arms-length sales of coal between petitioner and its parent company, Black Hills Corporation, cannot be valued under Wyo.

Stat. Ann. § 39–2–209(e) or its identical successor statute.

5.  Whether the board erred in holding that the department properly valued the sales of coal from petitioner to the Wyodak power plant for the use of both Black Hills Corporation and PacifiCorp for coal production years 1995, 1998 and 1999 as mine mouth sales under Wyo. Stat. Ann. § 39–2–209(b) and its identical successor statute.

6.  Whether the board erred in holding that the department may use an alternate valuation method under Wyo. Stat. Ann. § 39–2–202(d) for production years 1993, 1994, 1995, 1998 and 1999 when coal is specifically required to be valued under Wyo. Stat. Ann. § 39–2–209 and its identical successor statute.

7.  Whether the board erred in affirming or upholding the department's valuation of coal sold by petitioner in nonarms-length sales to Black Hills Corporation's plants other than the Wyodak power plant when the valuation was based upon the transfer price between related entities.

8.  Whether the board erred in holding that the sale transactions used by petitioner's coal valuation expert were not comparable contracts under Wyo. Stat. § 39–2–209(e).

Responsively, DOR frames the issues in the following manner:

1.  Could Wyodak, which had previously appealed and fully litigated its 1992 coal valuation, raise new valuation issues concerning its 1992 production, or do the doctrines of *res judicata,* claim preclusion and waiver bar such new claims?

2.  Was Wyodak, after it knowingly and intentionally did not timely appeal the Department's notices of valuation as required by statute, permitted to challenge the Department's valuation methodology through refund requests?

3.  Under the facts of this case, was Wyodak permitted to value its non-arms-

---

1.  The legislature recodified Title 39 effective March 6, 1998, without making substantive changes. 1998 Wyo. Sess. Laws ch. 5. We will cite to the current, recodified statutes.

2.  "Spot Market" or "spot sales" refers to coal sold under contracts of less than one year in duration. *See* Instructions to Complete Form 8101 MTD (Rev. Jan. 1999), Annual Gross Products Report for Coal, line 1b.

length coal sales to parent company Black Hills, using a spot market average price pursuant to Wyo. Stat. § 39–2–209(e), and its identical recodification, which required that comparable long-term or spot market sales of like quality, quantity, terms and conditions be used?

4. Did the Department properly value Wyodak's coal sales to Pacificorp and parent company Black Hills for production years 1995, 1998 and 1999, as mine mouth sales pursuant to Wyo. Stat. § 39–2–209(b) and its recodification, Wyo. Stat. § 39–14–103(b)(v)?

5. In the event that no methodology pursuant to Wyo. Stat. § 39–2–209, or its recodification, Wyo. Stat. § 39–14–103, applies or renders a fair market valuation for taxation purposes, may the Department alternatively use recognized appraisal techniques pursuant to Wyo. Stat. § 39–2–202(d), recodified as Wyo. Stat. § 39–14–102(c)?

6. Assuming a recognized appraisal technique could be used pursuant to Wyo. Stat. § 39–2–202(d) and its recodification, could the Department value Wyodak's coal sales to parent Black Hills using Wyodak's arms-length sales to Pacificorp, under the same contract, as a comparable to determine the revenue number, and then perform a proportionate profits calculation to derive taxable value?

## FACTS

[¶ 3] Wyodak sells most of the coal it produces to the owners of the power plant located immediately adjacent to the mine. PacifiCorp owns eighty percent of the plant, and Black Hills—Wyodak's parent company—owns twenty percent. In 1987, Wyodak entered into a coal supply agreement with the two companies which provided for the sale to them of all coal required to fuel the plant for twenty-six years in proportion to their respective interest in the plant. Pursuant to the applicable statutes and regulations, Wyodak filed annual reports of the value of the gross product it produced for use by DOR in determining the appropriate assessment for *ad valorem* tax and severance tax purposes. Wyo. Stat. Ann. § 39–14–107

(LexisNexis 2001). Until 1997, Wyodak filed its gross product reports using the contract price it received for the coal from PacifiCorp and Black Hills. From 1992 through 1995, that price ranged from $9.57 per ton to $10.33 per ton. Each year, DOR issued its Notice of Valuation (NOV), and Wyodak paid its taxes based upon those reported values.

[¶ 4] DOR conducted an audit of certain Wyodak annual production reports including those filed for the 1992 tax year. Upon receipt of DOR's final determination and assessment, Wyodak filed an appeal with SBOE challenging DOR's treatment of the costs to relocate a state highway as direct mining costs. SBOE affirmed DOR's final determination, Wyodak appealed that decision to this court, and we also affirmed DOR's actions. *Wyodak Resources Development Corp. v. State Board of Equalization,* 9 P.3d 987 (Wyo.2000). During the appeal process, Wyodak did not raise any other issue concerning the propriety of its previously reported gross product values.

[¶ 5] Beginning in 1997, Wyodak changed its position regarding gross value. First, it filed an amended gross product report and a request for refund for production year 1992. Ultimately, it filed amended reports and refund requests for 1993 through 1995, 1998, and 1999 production, claiming a lower gross product value for each year based on its interpretation of § 39–14–103(b)(viii) that spot market prices must be utilized to determine the value of nonarms length sales. In addition, it requested a refund of the taxes it contended were overpaid. DOR refused to process the amended production report and refund request for 1992 concluding they represented an effort to reopen that tax year which had been audited, appealed, and affirmed by SBOE and Wyodak had waived its right to appeal and change the valuation methodology with regard to that year. DOR contended the doctrine of *res judicata* precluded such an effort. DOR likewise rejected the amended production reports and requests for refund filed for the years 1993 through 1995. For these years, DOR concluded the statutory requirement that valuations be appealed within thirty days precluded later refund requests which raised issues

that could have been raised in an appeal. Wyo. Stat. Ann. § 39–14–209(b)(iv) (LexisNexis 2001).

[¶ 6]   DOR also rejected the spot market values Wyodak reported for 1998 and 1999 and instead issued NOVs which utilized the contract price.   DOR took the position that spot market prices were not comparable to Wyodak's contract and, therefore, § 39–14–103(b)(viii) did not apply.   Instead, DOR contended the sale was at the mouth of the mine and Wyo. Stat. Ann. § 39–14–103(b)(v) (LexisNexis 2001) applied or, in the alternative, it was entitled to utilize accepted appraisal techniques pursuant to Wyo. Stat. Ann. § 39–14–102(c) (LexisNexis 2001) which included use of comparable sales to value non-arms length sales and the PacifiCorp sale at the contract price was the most comparable. Wyodak appealed the 1998 and 1999 NOVs as well as DOR's refusal to process 1992 through 1995 amended production reports and requests for refund.  SBOE consolidated all the appeals and held a three-day contested case hearing in January of 2001.

[¶ 7]   At the hearing, in addition to contending § 39–14–103(b)(viii) was the exclusive method for valuing its coal production, Wyodak claimed the facts did not support a finding the sale occurred at the mouth of the mine.   DOR contended a 1992 Coal Handling Facilities Agreement for the ownership and operation of certain coal handling and conveyance facilities which transported the coal from the north pit to the plant demonstrated the buyers took possession of, and responsibility for, the coal in the pit resulting in a sale at the mouth of the mine.   Although the agreement located the transfer of title to the coal at the secondary crusher outside of the pit, it also provided Black Hills and PacifiCorp jointly assumed financial responsibility for all the costs associated with conveyance of the coal from the pit to the power plant. After execution of the Coal Handling Facilities Agreement, Wyodak and its parent company—Black Hills—entered into another agreement which purported to convey Black Hills' interest in the coal conveyance facilities

to Wyodak.   Although the parties never signed this later agreement, an exchange of funds occurred between the two affiliated companies.   On the basis of these facts, Wyodak argued the sale did not occur at the mouth of the mine and § 39–14–103(b)(v) could not apply.

[¶ 8]   SBOE issued its decision on August 8, 2001, affirming DOR's actions in all respects relevant to this appeal.[3]   Wyodak filed a petition for review of administrative action in the district court, and the district court certified the matter to this court pursuant to W.R.A.P. 12.09(b).

## STANDARD OF REVIEW

[¶ 9]   This appeal raises fundamental issues regarding the appropriate construction of the *ad valorem* tax and severance tax statutes and is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2001) of the Wyoming Administrative Procedure Act, which provides in part:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.   In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error.   The reviewing court shall:

. . .

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

. . .

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right[.]

When an administrative agency case is certified to this court under W.R.A.P. 12.09(b), we

---

**3.**   SBOE reversed DOR's decision to add on fees of $.31 per ton to Wyodak's value for 1993 through 1995 production and remanded the mat-

ter for recalculation.   Wyodak did not appeal this aspect of SBOE's decision.

review the decision under the appellate standards applicable to a reviewing court of the first instance. *Amax Coal Company v. Wyoming State Board of Equalization*, 819 P.2d 825, 828 (Wyo.1991). The construction and interpretation of statutes are questions of law which we review *de novo*. *Powder River Coal Company v. Wyoming State Board of Equalization*, 2002 WY 5, ¶ 6, 38 P.3d 423, ¶ 6 (Wyo.2002); *Osenbaugh v. State ex rel. Wyoming Workers' Safety and Compensation Division*, 10 P.3d 544, 547 (Wyo.2000). We affirm an agency's conclusions of law when they are in accordance with the law. *Powder River Coal Company*, 2002 WY 5, ¶ 6, 38 P.3d 423. However, when the agency has failed to properly invoke and apply the correct rule of law, we correct the agency's error. *Id.*

## DISCUSSION

### A. 1992 Production—*Res Judicata*

[¶ 10] DOR argues Wyodak's failure to raise the issue of the application of § 39–14–103(b)(viii) in its appeal of the final assessment of the 1992 production triggered the doctrine of *res judicata* and precluded Wyodak from again challenging the valuation for that production year in the form of an amended production report and refund request. In response, Wyodak contends no issue preclusion arose because this issue was not addressed in the audit. Wyodak hints in its brief that perhaps it might have even been unable to raise the issue of the use of spot market prices instead of contract price in the valuation of its 1992 coal production. It points to DOR's final audit determination letter which stated, "Exceptions to this assessment may be instituted pursuant to Rules, Chapter 2, Section 5, Wyoming State Board of Equalization, by filing a written notice of appeal with the Board." Apparently, Wyodak contends DOR's use of the language "this assessment" somehow limited the scope of its right to appeal the final assessment to only those issues DOR addressed in the audit. However, no such limit appears in the language of the final assessment letter, the statute, or the applicable rules. Wyodak was not prevented from raising this issue on appeal from the final assessment simply because the issue of whether the contract price or spot market prices should have been utilized for valuing the coal production was not the focus of the audit. In fact, the issues on appeal were limited only by Wyodak's choice.

[¶ 11] The doctrine of *res judicata* applies to final determinations from administrative proceedings. *University of Wyoming v. Gressley*, 978 P.2d 1146, 1153 (Wyo.1999); *Slavens v. Board of County Commissioners for Uinta County*, 854 P.2d 683, 685 (Wyo. 1993).

> Res judicata bars the relitigation of previously litigated **claims** or **causes of action.** Four factors are examined to determine whether the doctrine of res judicata applies: (1) identity in parties; (2) identity in subject matter; (3) the issues are the same and relate to the subject matter; and (4) the capacities of the persons are identical in reference to both the subject matter and the issues between them.

*Eklund v. PRI Environmental, Inc.*, 2001 WY 55, ¶ 15, 25 P.3d 511, ¶ 15 (Wyo.2001) (citation omitted). This doctrine furthers society's interest in having disputes conclusively resolved in a single action and minimizing the expense and difficulties of piecemeal litigation. *DLB v. DJB (Paternity of JRW)*, 814 P.2d 1256, 1264 (Wyo.1991).

[¶ 12] In addition to precluding issues previously raised and litigated from being the subject of later challenges, the doctrine precludes issues that could have been raised in the first action. *Cermak v. Great West Casualty Company*, 2 P.3d 1047, 1054 (Wyo.2000). We have explicitly stated that claim preclusion has "the effect of foreclosing any litigation of matters that never have been litigated because of a determination that they should have been advanced in an earlier suit." *Id.* at 1053. A full and fair opportunity to litigate an issue is all that is required for the doctrine to apply. *Bender v. Uinta County Assessor*, 14 P.3d 906, 910 (Wyo.2000); *Wilkinson v. State ex rel. Wyoming Workers' Safety and Compensation Division*, 991 P.2d 1228, 1234 (Wyo.1999).

[¶ 13] Wyodak had the right to challenge the 1992 valuation and assessment and exercised that right by appealing the

final assessment through the administrative process and, ultimately, to this court. *Wyodak Resources Development Corp.*, 9 P.3d 987. We affirmed Wyodak's 1992 valuation as determined by DOR and confirmed by SBOE and found they had correctly considered the claims raised by Wyodak "in determining the taxable value of the coal production from this mine." *Id.* at 992. After the 1992 valuation and assessment were final, audited, appealed, and affirmed by SBOE and this court, the taxpayer now asks us to consider yet another, albeit different, objection it has to that assessment. We conclude the doctrine of *res judicata* prevents that effort. To permit Wyodak to reopen the 1992 assessment and corresponding tax liability would undermine the finality critical to a sound tax system and subject the agency and the courts to endless litigation. This we cannot condone. The process provided this taxpayer with ample opportunity to challenge the agency's determination of the value of its coal production, and DOR was not required to allow the taxpayer to mount yet another challenge to that value.

## B. Refund Requests for Production Years 1993 through 1995

[¶ 14] The 1993 through 1995 NOVs notified Wyodak of the thirty-day time limit to object and appeal final valuations to SBOE. The appeal period to which DOR was referring is set out in Wyo. Stat. Ann. § 39–14–109(b)(i) (LexisNexis 2001), which provides in pertinent part:

(i) Following determination of the fair market value of property the department shall notify the taxpayer by mail of the assessed value. The person assessed may file written objections to the assessment with the board within thirty (30) days of the date of postmark and appear before the board at a time specified by the board.

Wyodak chose not to appeal those valuations and assessments despite DOR's acceptance of its reported gross product value which was the contract price of the coal sold to its parent company. Instead, in 1998, Wyodak filed amended gross product reports for both *ad valorem* taxes and severance taxes for production years 1993 through 1995 claiming § 39–14–103(b)(viii) required the gross product value be determined by spot market prices.[4] It also requested a refund of taxes paid on the higher value originally reported pursuant to Wyo. Stat. Ann. § 39–14–109(c) (LexisNexis 2001). Again, DOR refused to accept Wyodak's amended production reports which claimed different values for *ad valorem* taxes and severance taxes contending they were "simply a device for appealing the original notices of valuation for the 1993–1995 production periods after the appeal periods had lapsed."

[¶ 15] To resolve whether that appeal deadline precluded Wyodak's requests for refund of either *ad valorem* taxes or severance taxes, we must examine the statutes governing those refunds and determine how they interrelate to the remedy provided by the appeal provision. The statutes provide different refund procedures for *ad valorem* taxes and severance taxes on coal production. Section 39–14–109(c)(i) states in pertinent part: "If any person pays any tax, or portion thereof, found to have been erroneous or illegal, the board of county commissioners shall direct the county treasurer to refund the erroneous or illegal payment to the taxpayer." Although not stated directly, because this provision pertains to counties and counties are responsible for collecting *ad valorem* taxes, we can assume this provision applies to *ad valorem,* and not severance, taxes. No time limit is provided for refund requests for *ad valorem* taxes under this

---

4. Although the record is somewhat confusing, it appears both *ad valorem* taxes and severance taxes were placed at issue by Wyodak's amended reports and refund requests. In SBOE 99–158, Wyodak appealed DOR's refusal to process its amended reports for 1992 through 1995. Each amended report for those years provided "new" computations using the spot market price for both severance tax and "gross products tax." Gross products tax is the same as *ad valorem* tax

as we noted in *Wexpro Company v. Brimhall*, 7 P.3d 42, 43 (Wyo.2000). In SBOE 99–90, Wyodak appealed DOR's final audit letter "for severance and ad valorem taxes for production years 1993–1995." In SBOE 99–70 (1998 production) and SBOE 2000–99 (1999 production), Wyodak appealed the NOVs for the 1998 and 1999 gross product reports which were utilized for both severance tax and *ad valorem* tax purposes.

provision.[5] However, the tax must have been found to be "erroneous or illegal" before a county is required to pay a refund.

[¶ 16] A second provision governs refund of severance taxes. Section 39–14–109(c)(ii) provides refund of taxes "imposed by this article" may be requested whenever a taxpayer has reason to believe those taxes were overpaid. "[T]his article" refers to Article 1, "Coal," of Chapter 14, "Mine Product Taxes." The only tax imposed by this article is severance tax on the value of the gross product for the privilege of severing or extracting coal in the state. Wyo. Stat. Ann. § 39–14–103(a) (LexisNexis 2001). The statute specifies a severance tax refund request must be filed within five years after the end of the calendar year in which the claimed overpayment was made. Section 39–14–109(c)(ii). Wyodak's amended production reports suggested different gross product values for both *ad valorem* taxes and severance taxes. The refund requests filed with DOR were specifically for severance taxes which were paid directly to the state. It is unclear whether those refund requests were also intended for *ad valorem* taxes collected by the county. However, if DOR had accepted the amended production reports, the new valuations would have been certified to the county, and § 39–14–109(c)(i) would have mandated the county refund the overpayment as an "erroneous" tax. Consequently, the refund provisions for both taxes are implicated in this appeal.

[¶ 17] DOR rejected Wyodak's amended production reports and refund requests without determining whether the taxes were erroneous or illegal or whether overpayments were made. Instead, DOR concluded, when a taxpayer is aware of possible objections at the time it receives a final NOV, it must appeal that valuation within the thirty-day appeal period and cannot file amended production reports and refund requests at a later date. DOR contends Wyodak was fully aware of the statute concerning the valuation of coal in nonarms length sales and could have made its argument at the time of the final NOVs. DOR argues, if amended production reports and refund requests can be filed after the thirty-day appeal period even when the taxpayer is aware of the possibility of a "mistake," the time limitation is rendered meaningless and valuations will have no finality. In response, Wyodak claims the procedures for appeals of valuations and requests for refund represent separate and distinct remedies.

[¶ 18] In the conduct of statutory interpretation, we begin by inquiring into the ordinary and obvious meaning of the words employed by the legislature according to the manner in which those words are arranged. If more than one reasonable interpretation exists, we resort to general principles of statutory construction. When the legislature has spoken in unambiguous terms, however, we are bound to the results so expressed. *State by and through Wyoming Department of Revenue v. Buggy Bath Unlimited, Inc.*, 2001 WY 27, ¶ 7, 18 P.3d 1182, ¶ 7 (Wyo.2001).

[¶ 19] We have also observed:

It is the court's obligation to make sense out of a statute and give full force and effect to the legislative product; in construing statutes, intention of the law-making body must be ascertained from the language of the statute as nearly as possible. A statute must not be given a meaning which would nullify its operation if it is susceptible of another interpretation.

*Hasser v. Flint Engineering*, 647 P.2d 66, 69–70 (Wyo.1982). Likewise, we will not construe a statute in a way that renders a portion of it meaningless. *Fosler v. Collins*, 13 P.3d 686, 692 (Wyo.2000); *US WEST Communications, Inc. v. Wyoming Public Service Commission*, 989 P.2d 616, 619–20 (Wyo.1999). With these precepts firmly in mind, we consider the proper meaning of the statutes in question in the context of the

---

5. The statute does discuss the situation where an increase in value that is subject to approval by an agency of the federal or state government is ultimately disapproved and taxes are paid on the increased amount. Under this statute, any person who paid taxes on that increased amount may apply for a refund within one year of the final determination of value, and the board of county commissioners must refund the amount of the excess tax paid. Section 39–14–109(c)(i). That situation is not applicable in this case.

entire tax system as established by the constitution and the tax code as a whole.

[¶ 20] On several occasions, this court has agreed with the proposition as stated by Wyodak that appeals and refund requests are different remedies and both are available to taxpayers. *Amax Coal West, Inc. v. Wyoming State Board of Equalization*, 896 P.2d 1329 (Wyo.1995); *Amoco Production Company v. Board of Commissioners of Carbon County*, 876 P.2d 989 (Wyo.1994); *Atlantic Richfield Company v. Board of County Commissioners of County of Sweetwater*, 569 P.2d 1267 (Wyo.1977). In *Amax Coal West*, the court found, pursuant to earlier versions of the statute, that, since Amax had neither appealed the valuation for *ad valorem* taxes nor "applied for a refund of any excess taxes it had paid pursuant to WYO. STAT. § 39–6–304(g) (1985) (repealed 1988)," it waived its right to later contest the tax. 896 P.2d at 1332–33. A strong inference can be drawn from the court's language that the right to apply for a refund of *ad valorem* taxes exists separately from the right to appeal the valuation within thirty days. Likewise, in *Atlantic Richfield Company*, we concluded the refund process for erroneous or illegal *ad valorem* taxes does not require the taxpayer to file an appeal within thirty days of the valuation determination. In that case, the valuation was decreased as a result of a federal court ruling, issued after the taxpayer had filed its production report, which increased the required federal royalty. The facts in *Amoco Production Company* are more closely analogous to this case, and, therein, we held an appeal within thirty days of the valuation determination was not required before a taxpayer could file amended production reports and an *ad valorem* tax refund request. In 1985, Amoco discovered mistakes in its production reports as a result of an internal audit and filed amended reports for production years 1980 through 1984. 876 P.2d at 991.[6] This court held the refund statute for *ad valorem* taxes was available for "erroneous" as well as "illegal" taxes when the taxpayer discovered mistakes in the gross product reports after the thirty-day appeal period had expired. Further, we made it clear, if

the state accepted the amended production reports and adjusted the valuations, the taxes paid on the original valuations were "erroneous." *Id.* at 995. We recognized "[m]any valid reasons exist for a taxpayer to amend its report subsequent to the thirty day period. Examples of those grounds called to our attention included adjustment of interest owners' values and volumes." *Id.* at 994. Our opinion did not disclose the reasons for Amoco's mistake or whether it could have, with due diligence, discovered the mistake earlier. Although certain dicta in the opinion speculated the legislature may have provided for refunds to afford relief to taxpayers who do not know of mistakes at the time of the filing, the holding provided no appeal within thirty days was required before amended production reports could be filed and a refund of *ad valorem* taxes could be requested. *Id.*

[¶ 21] No case has directly addressed whether amended production reports and refund requests can be filed after the thirty-day appeal period in cases where the taxpayer was, or arguably should have been, aware of the basis for the refund request at the time of the final valuation. DOR contends the primary reason the *Amoco Production Company* court concluded *ad valorem* tax refund requests should be allowed after the thirty-day appeal period was to provide relief for the taxpayer who might not have been aware of the erroneous nature of a tax until sometime after the tax was paid. Armed with this rationalization, DOR argues Wyodak was capable of urging its interpretation of § 39–14–103(b)(viii) since the adoption of its substance in 1990. No one disputes Wyodak was charged with knowledge of the statute at the time of its passage. Further, DOR witnesses testified Wyodak representatives contacted them on numerous occasions to discuss the possible applicability of the statute and were informed DOR did not agree the statute applied in Wyodak's situation. The record discloses Wyodak chose not to argue the point for its own business and strategic reasons until 1997 when it began to file amended production reports and requests for refund.

---

6. Similarly, Wyodak sought to file amendments in 1997 for its 1992 through 1995 production.

[¶ 22] Even accepting these facts as true, we fail to see how these circumstances prevented Wyodak from taking advantage of remedies the legislature provided to "any person" who filed within five years of the alleged overpayment or paid a tax determined to be erroneous. This conclusion is consistent with this court's statement in *Amoco Production Company* regarding the *ad valorem* tax refunds that " 'the legislature has determined ... the taxpayer is entitled to a remedy—a remedy which will recover for the taxpayer those taxes which were not justly or equitably due from him and—at the same time—will avoid an unjust enrichment of the particular taxing entity.' " 876 P.2d at 994 (quoting *Atlantic Richfield Company*, 569 P.2d at 1273).

[¶ 23] We are not inclined to judicially impose a due diligence standard upon taxpayers which would mandate they appeal every valuation in order to preserve a future argument concerning the legality of an assessment. To reach that conclusion, we would have to read language into the statute that is not there. *Voss v. Ralston*, 550 P.2d 481, 485 (Wyo.1976). Had the legislature intended such a limitation on the right to request a tax refund, it would have said so. Instead, the legislature chose to mandate a refund of *ad valorem* taxes whenever a tax is deemed erroneous or illegal and to impose a five-year statute of limitation on refund requests for overpayment of severance taxes.

[¶ 24] Our hesitancy to judicially impose a condition precedent to the right of a refund of either erroneous *ad valorem* taxes or the overpayment of severance taxes is enhanced when we review the legislative history of the applicable provisions and see how often the legislature has considered this issue and, ultimately, declined to impose a statute of limitation on requests for refund of *ad valorem* taxes, imposed a clear statute of limitation on application for refund of severance taxes, and made no mention whatsoever of the need to file an appeal of the valuation before such refund can be requested. With regard to *ad valorem* tax refunds, the two applicable statutory provisions have existed since before statehood: § 39–14–109(c)(i), which directs the county to refund any erroneous tax without a statute of limitation; and Wyo. Stat. Ann. § 39–13–109(c)(i) (LexisNexis 2001), which provides an action may be filed in district court within one year after the assessment to enjoin an erroneous tax. The substance of § 39–14–109(c)(i),[7] enacted in 1876, was originally found in a chapter entitled "Territorial and County Revenue," and the substance of § 39–13–109(c)(i),[8] enacted in 1886, was originally located in the "Code of Civil Procedure." No severance tax existed when these original versions were enacted, and both sections have since found their way into tax code statutes pertaining to *ad valorem* taxes. The *Atlantic Richfield Company* court found these two sections were neither mutually exclusive nor conflicting and the first offered an administrative remedy with no statute of limitation and the second afforded a distinct judicial remedy with a one-year limitation.

[¶ 25] Severance taxes were first adopted in 1969. 1969 Wyo. Sess. Laws ch. 193. In that same year, the legislature enacted the substance of Wyo. Stat. Ann. § 39–6–304(g) (Michie 1985) (repealed 1988) and mandated *any* excess tax found to be erroneous, the result of an overpayment,[9] or the result of an appeal be refunded so long as application for such refund was made within two years from payment. Although this provision appears in the severance tax section, on its face, it applies to *any* tax. In a case involving a severance tax refund request, we held this two-year statute of limitation was an absolute bar to later requests for refund irrespective of whether the taxpayer knew about the erroneous tax at the time of the assessment. *Amoco Production Company v. Wyoming State Board of Equalization*, 797 P.2d 552,

---

7. Previously Wyo. Stat. § 39–116 (1957) and Wyo. Stat. Ann. § 39–4–101(b) (Michie 1997) (repealed 1998).

8. Previously Wyo. Stat. § 39–157 (1957) and Wyo. Stat. Ann. § 39–3–203 (Michie 1997) (repealed 1998).

9. "Overpayment" was added by amendment in 1980. 1980 Wyo. Sess. Laws ch. 17, § 1.

555 (Wyo.1990). We noted that the alleged difficulty taxpayers might have complying with such a time limit was a matter for the legislature. *Id.* Two other cases that followed, *Enron Oil & Gas Company v. Freudenthal,* 861 P.2d 1090, 1094–95 (Wyo.1993), and *CIG Exploration, Inc. v. State, Department of Revenue,* 880 P.2d 601, 603 (Wyo. 1994), were decided consistently with *Amoco Production Company,* 797 P.2d 552, and concluded § 39–6–304(g) was a statute of repose intended to place the burden of timely filing on the taxpayer. We find it significant the legislature repealed § 39–6–304(g) in 1988 and, at the same time, adopted the substance of § 39–14–109(c)(ii) which extended the time for filing refund requests from two years to five years but applied that requirement to only severance taxes. The legislature did not impose a specific time limit on refund requests for *ad valorem* taxes.[10]

■ [¶ 26] Despite the numerous revisions and recodifications of the tax code since the first refund provision was adopted in 1876 and this court's decisions indicating the separate and distinct nature of the appeal and refund remedies, the legislature has not chosen to impose an obligation of due diligence on the taxpayer as a condition precedent to the filing of a refund request. Nor has the legislature imposed a statute of limitation on requests for refund of erroneous or illegal *ad valorem* taxes. To impose such limitations on the remedies provided by the legislature to taxpayers in light of this legislative history would constitute an improper exercise of judicial power. "[T]he enactment of tax measures is exclusively within the providence of the legislature." *Wyoming State Tax Commission v. BHP Petroleum Company Inc.,* 856 P.2d 428, 439 (Wyo.1993); *see also* Wyo. Const. art. 3, § 35. In the same vein, the following description is as apt today as it was in 1929:

> "The courts can not venture upon the dangerous path of judicial legislation to supply omissions, or remedy defects in matters committed to a co-ordinate branch of the government. It is far better to wait

for necessary corrections by those authorized to make them, or, in fact, for them to remain unmade, however desirable they may be, than for judicial tribunals to transcend the just limits of their constitutional powers."

*Midwest Hotel Co. v. State Board of Equalization,* 39 Wyo. 461, 273 P. 696, 699 (1929) (quoting *State ex rel. Crow v. West Side Street Railway Company,* 146 Mo. 155, 47 S.W. 959, 961 (1898)).

■ [¶ 27] In addition to suggesting an interpretation of the statutes which would prohibit amended production reports and refund requests after the time limit for appeals, DOR argues we should reach the same result on the basis of the doctrine of laches. SBOE agreed and affirmed DOR's refusal to consider the amended production reports and refund requests relying, in part, on laches. That doctrine requires findings of (1) inexcusable delay and (2) injury, prejudice, or disadvantage to the party claiming laches. *Thompson v. Board of County Commissioners of County of Sublette,* 2001 WY 108, ¶ 17, 34 P.3d 278, ¶ 17 (Wyo.2001). Neither DOR nor SBOE made such findings and, we believe, could not do so under these facts. Certainly, the "delay" cannot be considered inexcusable when the taxpayer complies with the statute of limitation provided by the legislature. *Advanced Cardiovascular Systems, Inc. v. SciMed Life Systems, Inc.,* 988 F.2d 1157, 1161 (Fed.Cir.1993) ("When a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period"); *Morad v. Brown,* 549 P.2d 312, 317 (Wyo. 1976); *Aronovitch v. Levy,* 238 Minn. 237, 56 N.W.2d 570, 574 (1953). Likewise, no prejudice can be inferred when the legislative process is followed.

■ [¶ 28] As we interpret statutes, we must read them in context and harmonize them in a sensible fashion. *Wyoming Community College Commission v. Casper Community College District, State of Wyoming,* 2001 WY 86, ¶ 22, 31 P.3d 1242, ¶ 22 (Wyo. 2001). When we do so in this situation, we

---

10. In 1991, the legislature imposed a time limit on audits by the state to five years back in time and provided an offsetting credit for any over-

paid gross product or severance tax within the scope of the audit. *See* Wyo. Stat. Ann. §§ 39–14–108(b)(vii), –109(d)(ii) (LexisNexis 2001).

can reach only one conclusion: The right to request a refund of severance taxes existed for five years after the calendar year in which the overpayment of tax was made, and no limitation existed for a refund request for *ad valorem* taxes; however, a refund could be granted only when there was a determination such tax was erroneous or illegal.

▆▆▆▆ [¶ 29] We are not concluding Wyodak was entitled to the refund requested herein. No such entitlement would arise unless and until DOR concluded the previous valuations were erroneous or an overpayment occurred. Our holding is limited to whether Wyodak has a right to have its amended production reports considered at all. DOR conceded Wyodak's severance tax refund requests for the years 1993 through 1995 were timely and properly filed. The decision to refuse to accept and process the amended production reports was improper and beyond DOR's statutory authority.

"An administrative agency is limited in authority to powers legislatively delegated. 'Administrative agencies are creatures of statute and their power is dependent upon statutes, so that they must find within the statute warrant for the exercise of any authority which they claim.' " *Amoco Production Co. v. State Bd. of Equalization,* 12 P.3d 668, 673 (Wyo.2000) (citations omitted). "An agency is wholly without power to modify, dilute or change in any way the statutory provisions from which it derives its authority." *Platte Development Co. v. State, Environmental Quality Council,* 966 P.2d 972, 975 (Wyo.1998). *Billings v. Wyoming Board of Outfitters and Guides,* 2001 WY 81, ¶ 24, 30 P.3d 557, ¶ 24 (Wyo.2001); *see also Lineberger v. Wyoming State Board of Outfitters and Professional Guides,* 2002 WY 55, ¶ 20, 44 P.3d 56, ¶ 20 (Wyo.2002).

## C. Valuation of Coal Sold by Wyodak to Its Parent Company

[¶ 30] Now we turn to the fundamental issue in this case: What valuation method do the statutes provide for the coal Wyodak sold to its parent company? Historically, Wyodak reported its gross product value using the price per ton for which it sold its coal to its parent company and an arms length customer—PacifiCorp—pursuant to a single, long term contract. In 1990, the legislature enacted the substance of § 39–14–103(b)(viii), which provides:

(viii) For coal used without sale, or coal not sold pursuant to a bona fide arms-length agreement, the sales value for the purposes of paragraph (vii) of this subsection shall be the fair market value of coal which is comparable in the quality, quantity, terms and conditions under which the coal is being used or sold, both in the spot market and through long-term agreements negotiated within the previous twelve (12) months, multiplied by the respective number of tons used or sold for each reporting period[.]

[¶ 31] Wyodak argues the sale to its parent company—Black Hills—of twenty percent of the coal produced was not arms length and, therefore, this statute applied to that sale exclusive of other valuation methods provided in the statutes. However, Wyodak ignores the fact that the remaining eighty percent of the coal was sold under the same contract and at the same price in an arms length transaction. In adopting this statute, the legislature likely did not consider this unique situation in which both arms length and nonarms length sales occurred under the same contract, making application of the statute difficult at best.

[¶ 32] Wyodak's inability to identify another similar long term contract negotiated in the twelve months previous to the filing of the respective production reports presents an additional problem with applying this provision. Unable to identify a similar long term contract, Wyodak argues spot market prices for coal sold in the Powder River Basin must be used to determine the fair market value of its coal sold to Black Hills. DOR determined spot sales were not "comparable in the . . . terms and conditions under which the coal is being used or sold." Instead, DOR contended other statutory provisions applied which required the higher contract price be used as the basis for the value of Wyodak's coal sales to its parent company.

[¶ 33] To properly interpret the various statutes applicable to coal valuation, we must

first review their fundamental objective. The Wyoming Constitution requires the gross product of mines be taxed in proportion to the value thereof and uniformly valued for tax purposes at full value as defined by the legislature. Wyo. Const. art. 15, §§ 3, 11. The legislature defined "value of the gross product" as the fair market value less deductions and exemptions, Wyo. Stat. Ann. § 39–14–101(a)(xv) (LexisNexis 2001), and "fair market value" as "the amount . . . a well informed buyer is justified in paying for a property and a well informed seller is justified in accepting, assuming neither party to the transaction is acting under undue compulsion." Wyo. Stat. Ann. § 39–11–101(a)(vi) (LexisNexis 2001). With regard to the valuation of coal, the value of the gross product is the fair market value of the product at the mouth of the mine where produced, after the mining or production process is completed, and mining or production is deemed completed when the mineral product reaches the mouth of the mine. Wyo. Stat. Ann. § 39–14–103(b) (LexisNexis 2001). The "mouth of the mine" for a surface mine, such as Wyodak's, is further defined as "the top of the ramp where the road or conveying system leaves the pit." Wyo. Stat. Ann. § 39–14–101(a)(vi) (LexisNexis 2001). All these provisions read together provide the context within which the specific valuation methods contained in § 39–14–103(b) must be interpreted. While the valuation statutes may not result in seamless coverage of all possible mining situations, we conclude the legislature intended for those statutes to be interpreted so that mineral production would be valued at its full fair market value. Wyodak's contention that § 39–14–103(b)(viii) allowed coal sold to its parent company pursuant to a long term agreement to be valued on the basis of spot market prices is inconsistent with this conclusion.

[¶ 34] When coal sales are not arms length transactions, such as the sales by Wyodak to Black Hills, the potential exists that the sales price may not reflect the fair market value. Typically, one would presume the nonarms length sale price would tend to be lower and thereby more favorable to the preferred customer, such as a parent company, than the actual fair market value.

If such an artificially low price were utilized for purposes of taxation, the result would be a lower tax for operators selling to affiliated companies than that paid by other operators. That lack of uniformity would be unacceptable because "[t]he Wyoming Constitution mandates that all coal mines shall be taxed uniformly on the value of their gross product." *Amax Coal West, Inc.,* 896 P.2d at 1332. It is not surprising then that the legislature deemed it important to provide a method for assuring coal sold in nonarms length sales is valued at its full fair market value as if the sale were arms length. We perceive this to be the purpose of § 39–14–103(b)(viii). Using the fair market value of other arms length transactions to establish the value of the nonarms length sale in question assures the full market value is subject to tax. However, the statute requires those other sales to be of coal "which is comparable in the quality, quantity, terms and conditions under which the coal is being used or sold" and allows both the spot market and long term agreements negotiated within the previous twelve months to be utilized. Section 39–14–103(b)(viii). For this valuation method to be employed, comparable coal sales must first be identified, and those sales must be similar in terms and conditions to the nonarms length sale before they can be utilized to establish the value.

[¶ 35] As fundamental "terms," the lengths of the contracts must be comparable before § 39–14–103(b)(viii) can apply. It is well accepted that the price of coal sold under long term agreements is based upon different market considerations than the price of coal sold in the spot market. In fact, Wyodak's expert witness testified to the difference between spot sales and long term agreements and concluded that, if long term agreements reflected current market conditions, it would be accidental. Long term contracts provide security of supply at a stable price. That price is dependent on the market conditions in existence at the time the contract is negotiated and the length of the contract term. Both the buyer and the seller assume certain market risks that are not present in the spot market which can respond immediately to changes in market

conditions. Comparing spot market prices to long term prices is indisputably comparing apples to oranges, and we do not believe that is what the legislature intended. Instead, we believe it intended comparable spot sales be used to establish the value of nonarms length spot sales and comparable, long term agreements negotiated within the previous twelve months, if any can be identified, be used to establish the value of nonarms length, long term sales.

■ [¶ 36] In this case, Wyodak was unable to identify any similar long term contracts negotiated during the prior twelve months and, therefore, claimed spot market prices must be utilized. Under its interpretation, we would have to ignore the statute's requirement that the terms be "comparable," which we cannot do. *Board of County Commissioners of Laramie County v. Dunnegan*, 884 P.2d 35, 40 (Wyo.1994); *Enron Oil & Gas Company*, 861 P.2d at 1093.

[¶ 37] The record discloses other differences in "conditions under which the coal is being used or sold" between Wyodak's sales and spot sales. Coal sold by Wyodak was consumed by the adjacent plant and did not require the rail transportation needed for other spot sales from the Powder River Basin. That fact could affect the price a willing buyer would agree to pay a willing seller for the coal.[11] In addition, the coal supply agreement between Wyodak and its parent company required that specific coal reserves be committed to the buyers for twenty-six years. This fact could also affect the price upon which a willing buyer and a willing seller would agree.

[¶ 38] A final reason why applying this provision to Wyodak's circumstances was not likely what the legislature intended is the cost of mining the coal exceeded the spot market price upon which Wyodak relied. It is difficult to conceive the legislature intended for a ton of coal sold under a nonarms length agreement to be taxed at a value less than the cost incurred to mine the same ton

of coal. *Hillard v. Big Horn Coal Company*, 549 P.2d 293, 302 (Wyo.1976).

[¶ 39] Wyodak contends § 39–14–103(b)(viii) applied to its situation because no other statutory method did. DOR responds that there were two other applicable statutory provisions— § 39–14–103(b)(v), which applied to coal sold at the mouth of the mine; and § 39–14–102(c), which allowed use of "recognized appraisal techniques" to value coal not sold at the mouth of the mine in an arms length sale and for which no other provision was applicable.

[¶ 40] The mine mouth statute provides: "In the event the product as defined in paragraph (iii) of this subsection is sold at the mouth of the mine without further movement or processing, the fair market value shall be the price established by bona fide arms-length sale less exempt royalties." Section 39–14–103(b)(v). DOR contends Wyodak's coal was sold to its parent company at the mouth of the mine and the bona fide arms length sale to PacifiCorp should have been utilized to determine the fair market value of Wyodak's production. However, Wyodak contends this section did not apply because the coal was not sold at the mouth of the mine. The parties disagree over how the location of the point of sale should have been determined. DOR contends the point at which possession of, and responsibility for, the coal was transferred constituted the point of sale. In response, Wyodak argues the point of sale was where title transferred. The April 1, 1992, Coal Handling Facilities Agreement between Wyodak and its buyers—PacifiCorp and Black Hills—provided title transferred at the secondary crusher 1,670 feet from the mouth of the mine. Wyodak argues this fact caused the "sale" to occur at that point and not at the mouth of the mine. However, DOR points to the fact that the same agreement provided PacifiCorp (80%) and Black Hills (20%) owned and operated the coal handling facilities which transported the coal from the pit to the plant. Since the buyers assumed possession of, and responsibility for, the coal in the pit,

---

11. While Wyodak's expert testified the spot market prices he relied upon were adjusted to deduct the cost of transportation to the more distant buyers, he did not address questions raised concerning the possibility that a seller might be able to obtain a higher price if its buyer has little or no transportation cost.

DOR concluded the coal was in fact "sold" at the mouth of the mine. Wyodak references the later December 31, 1993, Agreement for the Sale of Certain Coal Handling Facilities, which provided Wyodak would purchase Black Hill's interest in the conveyance facilities and be responsible for transporting the coal away from the mouth of the mine. This nonarms length agreement was never signed, and the actual financial impact on the parties is unclear. Irrespective of these concerns, Wyodak contends it became responsible for delivering Black Hill's portion of the coal outside of the pit which prevented the sale of that coal from occurring at the mouth of the mine. Without question, PacifiCorp continued to take possession of the coal in the pit and assumed all responsibility for the coal from that point. The statute provides, "In the event the **product** ... is sold at the mouth of the mine," bona fide sales can be utilized to determine value. Section 39–14–103(b)(v) (emphasis added). DOR argued, and SBOE agreed, that, because eighty percent of the "product" was sold at the mouth of the mine, coal sales to both PacifiCorp and Black Hills should be considered mine mouth sales.

[¶ 41] We question whether Black Hill's nonarms length attempt to transfer financial responsibility for the coal conveyance facilities to its subsidiary should be considered determinative of the value of the coal. *State v. Davis Oil Company*, 728 P.2d 1107 (Wyo.1986). However, for two reasons, we do not perceive the significance of that issue to be as great as the parties apparently do. First, the primary thrust of the statutory distinction between mine mouth sales and sales away from the mouth of the mine appears to be to insure transportation costs are not considered part of the value of the gross product and not to be to determine how to value nonarms length sales that may occur away from the mouth of the mine. Section 39–14–103(b). Neither Wyodak nor DOR argues that Wyodak's contract price included transportation charges. Second, the legislature, in its wisdom, provided § 39–14–102(c) as a catch-all valuation method for situations which do not fit within the other specific valuation provisions. That section provides:

(c) Except as otherwise provided, in the event the product as defined in W.S. 39–14–103(b)(iii) is not sold at the mouth of the mine by bona fide arms-length sale, or if the product of the mine is used without sale, the department shall determine the fair market value by application of recognized appraisal techniques.

Section 39–14–102(c). Wyodak claims this section is limited by the phrase "[e]xcept as otherwise provided" and § 39–14–103(b)(viii) otherwise provides. As noted above, we disagree that § 39–14–103(b)(viii) applies where no contracts are identified with comparable terms. The application of "recognized appraisal techniques" includes the use of comparable sales or other bona fide arms length sales. *Amoco Production Company v. Wyoming State Board of Equalization*, 899 P.2d 855, 858 (Wyo.1995); Wyo. Stat. Ann. § 39–13–103(b)(ii) (LexisNexis 2001); Department of Revenue Rules ch. 6, §§ 4(n), 10. Consequently, whether § 39–14–103(b)(v) or § 39–14–102(c) applied, the statutes allowed the contract price paid by PacifiCorp, a comparable sale, to be utilized to determine value in this circumstance.

[¶ 42] This conclusion is unavoidable given the constitutional and statutory construct governing mineral taxation which mandates uniform taxation of the gross product at the full fair market value. Underlying all the issues in this dispute was the sale of the same coal to PacifiCorp under the same contract and circumstances, which no one disputes should be valued at the price paid pursuant to the long term coal supply agreement. In this case, we are not faced with the possibility the nonarms length sale has resulted in a price below fair market value. Instead, Wyodak's argument suggests the contract price was above the fair market value, and yet it was the same price PacifiCorp agreed to pay for the same coal in an unquestionably arms length agreement.

[¶ 43] We agree with DOR that the proper valuation of Wyodak's gross product was the price it actually received. We affirm SBOE's order upholding DOR's decision to "use the arms-length PacifiCorp coal price as a comparable ... to arrive at a fair market taxable value for Wyodak's non-arm's-length

sales to Black Hills" and hold Wyodak's amended production reports and requests for refund for production years 1993 through 1995 should have been rejected on their merits.

## CONCLUSION

[¶ 44]   We affirm DOR and SBOE's conclusion that the doctrine of *res judicata* barred Wyodak's amended report and refund request for production year 1992.   However, for production years 1993 through 1995, we reverse DOR's refusal to accept the amended reports and refund requests and SBOE's approval of that decision simply because Wyodak did not file appeals within thirty days after receipt of the notices of the final valuations for those years.   We find no such condition precedent to refund requests in the statutes.   Finally, we affirm DOR and SBOE's conclusions that § 39–14–103(b)(viii) did not apply in Wyodak's circumstance and § 39–14–102(c) allowed use of the sale to Pacifi-Corp as a comparable sale to establish the fair market value of coal sold to Wyodak's parent company.

[¶ 45]   Affirmed in part and reversed in part.