The STATE of Wyoming DEPARTMENT OF REVENUE, Appellant (Petitioner),

v.

AMOCO PRODUCTION COMPANY and Amoco Rocmount, Appellees (Respondents).

No. 98–65.

Supreme Court of Wyoming.

May 31, 2000.

Rehearing Denied June 29, 2000.

**36**

Representing Appellant: William U. Hill, Attorney General; and Vicci M. Colgan, Senior Assistant Attorney General, Cheyenne, Wyoming.

Representing Appellees: Algirdas M. Liepas of Wiederspahn, Liepas & Reese, P.C., Cheyenne, Wyoming; and John L. Bordes, Jr., Denver, Colorado.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and TAYLOR,* JJ.

TAYLOR, Justice, Retired.

The Department of Revenue appeals from the State Board of Equalization's (the Board) determination of tax and interest owed by Amoco Production Company. The Department of Revenue contends the Board abused its discretion in rejecting the Department of Revenue's application of the net-back method, and acted contrary to law in allowing the offset of credits for overpayment. Finding that the Board erred only as to the issue of offsetting credits, we affirm in part and reverse in part.

## I. ISSUES

Appellant, the Department of Revenue (the Department), presents the following issues for review:

1. Whether, when a mineral taxpayer sells its products and the purchaser "charges" a fee for its marketing and sales services, the fee is properly included in the gross sales price of the mineral, especially where the transaction is between related parties?

2. Whether the offsetting credit provision of Wyo. Stat. § 39–2–214(e) is properly applied to a mineral tax audit which

---

* Retired November 2, 1998.

commenced before the effective date of that statute?

3. Whether, when a mineral taxpayer makes a payment of delinquent taxes less than the taxpayer's liability, the payment is properly applied to the accrued interest on the debt, in the absence of any statute or agreement to do so?

Appellees, Amoco Production Company and Amoco Rocmount (collectively Amoco), phrase the issues as follows:

1. Did the Board of Equalization properly determine the true and correct taxable value for the natural gas liquids and sulfur production reported by Amoco?

2. Did the Board of Equalization act properly by taking into account overpayments during the audit period and applying them against underpayments?

3. Do the Department's arguments regarding standing alter the result that the Department is seeking an advisory opinion on whether taxing authorities may apply Amoco's payments in a way contrary to Amoco's designations concerning those payments?

4. Did the Board of Equalization act properly when it applied Amoco's partial payment to only the underlying tax liability and did not allow the Intervenor to apply that payment in violation of Amoco's designation regarding that payment?

## II. FACTS

Amoco is a corporation owning oil and gas interests in Uinta County. Beginning in 1986, the Department commenced an audit of Amoco's production from the Whitney Canyon, and later, initiated audits of the Painter Complex, Ryckman Creek, and Anschutz Ranch East properties. The audits addressed the production of natural gas liquids and sulfur during the years 1983 through 1988. The State Department of Audit, established in 1989, completed the audits, and in 1994, the Department issued five separate assessment notices to Amoco for additional severance taxes. The assessments also notified Amoco of additional taxable value for ad valorem taxes due to Uinta County. The additional taxable value was certified in five separate notices in February of 1994.

Amoco timely appealed the valuation to the Board, which consolidated the cases for a contested case hearing. Uinta County successfully moved to intervene in the case, questioning whether it was required to apply Amoco's partial payment of ad valorem tax to the principal, as designated by Amoco, or whether it may apply the payment to accrued interest. On February 28, 1997, the Board issued preliminary findings of fact and conclusions of law, and directed the parties to either agree to numerical calculations or to submit their own calculations in order to reach a final determination of tax liability. After the parties were unable to reach an agreement, the Board received separate calculations from the parties before issuing its Supplemental and Final Findings of Fact Conclusions of Law Order.

The portion of the Board's determinations relevant to this appeal include its finding that the Department incorrectly included a "market fee" in the gross sales price of Amoco's production. The Department also takes issue with the Board's determination that Amoco may offset the overpayments against underpayment over the years in question in order to calculate the interest and penalty due. Finally, the Department contends it has standing to challenge the Board's conclusion that Uinta County must apply Amoco's non-protested, partial ad valorem tax payment to the principal due. Further facts will be set forth as necessary in the discussion of these issues.

Certification to this Court occurred after two petitions for review were consolidated in the District Court for the Third Judicial District. By order dated March 19, 1998, this Court dismissed the appeal filed by Uinta County, as Uinta County is not entitled to judicial review pursuant to Wyo. Stat. Ann. §§ 39–1–306 and 39–1–101(a)(xi) (Michie Repl.1985). *See Basin Elec. Power Co-op., Inc. v. Department of Revenue, State of Wyo.*, 970 P.2d 841, 848 (Wyo.1998).

## III. STANDARD OF REVIEW

Our standard of review for an agency decision in a contested case is fully set forth in

*Basin Elec. Power Co-op., Inc.*, 970 P.2d at 850–51 (footnote omitted):

> When faced with contested issues of fact, we examine the entire record to determine if the agency's findings are supported by substantial evidence. * * * If so, we do not substitute our judgment for that of the agency and must uphold the factual findings on appeal. * * * Substantial evidence is more than a scintilla of evidence; it is relevant evidence which a reasonable mind might accept in support of the conclusions of the agency. * * *
>
> If a conclusion of law is in accord with the law, it is affirmed. * * * We consider three distinct possibilities when reviewing agency determinations of questions of law. * * * If the agency has correctly applied its findings of fact to the correct rule of law, the agency's conclusions are affirmed. * * * However, if the agency applied its findings of fact to the wrong rule of law or if the agency incorrectly applied its findings of fact to the correct rule of law, we must correct the error and reverse. * * *
>
> When an agency's determinations contain elements of law and fact, we do not treat them with the deference we reserve for findings of basic fact. * * * When reviewing an "ultimate fact," we separate the factual and legal aspects of the finding to determine whether the correct rule of law has been properly applied to the facts. * * * We do not defer to the agency's ultimate factual finding if there is an error in either stating or applying the law. * * *

"In examining the propriety of the valuation method, 'our task is not to determine which of various appraisal methods is best or most accurately estimates [fair market value]; rather, it is to determine whether substantial evidence exists to support usage of the [chosen] method of appraisal.'" *Amoco Prod. Co. v. State Bd. of Equalization*, 899 P.2d 855, 858 (Wyo.1995) (quoting *Holly Sugar Corp. v. State Bd. of Equalization*, 839 P.2d 959, 963 (Wyo.1992)). However, the disagreement between the parties here does not concern the Department's choice of appraisal methods. The controversy concerns the proper applica-

tion of those methods to the facts, which is an issue of ultimate fact, requiring *de novo* review.

## IV. DISCUSSION

### A. VALUATION

During the tax years in question, Amoco sold its production to Amoco Oil (the Purchaser), a sister subsidiary of the Amoco Corporation. Because there was no significant market for the product in Wyoming, the Purchaser paid Amoco the market value in out-of-state locations, minus transportation fees and a marketing fee. The marketing fee represented the Purchaser's costs relative to the sale of the product in remote locations, including administrative costs, working capital, and other costs associated with the means of transporting the product for final sale.

For the production years at issue here, 1983–1988, the statutes pertaining to mineral valuation provided:

> (d) In the event the product as defined in subsection (b) of this section is not sold at the mine or mining claim by bona fide arms-length sale, or if the product of the mine is used without sale, the department shall determine the fair cash market value by application of recognized appraisal techniques.

Wyo. Stat. Ann. § 39–2–202(d) (Michie 1977). The Department determined that because the contracts for sale were between related parties, the sale between Amoco and the Purchaser was not a bona fide arms-length sale. The Department, applying a net-back method, calculated Amoco's production by using the price paid by a third party to the Purchaser, and then deducting transportation and processing fees from that price. Because the market fees actually charged to Amoco by the Purchaser did not fall within transportation and processing deductions allowed by the Department, the Department concluded that Amoco's failure to include the amount of the market fee in its gross sale price resulted in under-reporting the value of its production. Amoco objected, contending that the contract between Amoco and the Purchaser was a bona fide arms-length

transaction, and thus accurately represented the fair market value of the product.

■ After a hearing on the matter, the Board agreed that the transactions between Amoco and the Purchaser were not bona fide arms-length sales, but found the Department failed to consider comparative sales between unrelated parties to make a reasonable estimate of fair market value of Amoco's production. The Board found that the method used by the auditors, and adopted by the Department, was an artificial manipulation of the components of the sale between related parties which could not duplicate the fair market value of an arms-length transaction. Therefore, the Board found that the Department had failed to employ an accepted method of appraisal.

Amoco presented evidence which demonstrated that the price paid by the Purchaser was equivalent to that paid in transactions between unrelated parties. Based on this evidence, the Board concluded that the initial assessment was a correct valuation.

■ On appeal, the Department argues that it properly used the net-back method when it did not allow a deduction of the "marketing fee." The net-back method arrives at fair cash market value at the point of valuation by subtracting the "value" added to the product by processing and transportation from the gross sales price of the product. *Amax Coal Co. v. Wyoming State Bd. of Equalization*, 819 P.2d 825, 827 n. 4 (Wyo. 1991). Generally, the starting point of the net-back valuation methodology is the amount received from the first third-party sale of mineral production. *Id.* at 827. As stated by the Board:

> It was imperative the [Department], as the appraiser, applying the netback method, determine what the market value of the products was at the point where the netback method was commenced. Any calculation of value based on an incorrect starting point inevitably results in an incorrect value even if the netback method is properly applied.

The Board concluded that proper appraisal technique does not permit an assumption that proper fair market value can be recreated by "manipulation of the dollar amounts" found in the books of these related, but separate, entities. Instead, the Department must determine the fair market value by looking to evidence of other third-party transactions at the point of sale. The Department had access to information regarding sales to the Purchaser from unrelated third parties, but did not utilize this information in its appraisal.

It is uncontested that Amoco never received credit or payment from the Purchaser for the amount of the market fee charged to Amoco. Further, the record contains evidence that the price calculations utilized the same method for the Purchaser's payment to Amoco and to other producers of the same products. Indeed, there is evidence that, at times, Amoco received a more favorable price, resulting in a report of higher value for its product than other suppliers.

In contrast, the Department failed to submit any market information, nor did it present evidence substantiating its position that the fair market value of Amoco's production should be higher than that of the Purchaser's other sources. Instead, the Department appears to rely on an assumption that the price paid pursuant to a transaction between related parties *cannot* be considered the fair market value of the product. Therefore, the *next* third-party transaction must be a starting point to reach the fair market value at the point of the first transaction. This assumption, however, is controverted by the facts in the record. The "marketing fees" which the Department insists on adding to Amoco's gross sales price had no relevance to the fair market value of Amoco's products. We find that the Board's decision is firmly rooted in the facts which were presented, and it is, therefore, affirmed.

### B. Offsets for Underpayment and Overpayments

The Board allowed Amoco to offset overpayments and underpayment for the audit period prior to calculating interest and penalties. It did so on a dual application of our holding in *Kunard v. Enron Oil & Gas Co.*, 869 P.2d 132, 134 (Wyo.1994) and Wyo. Stat. Ann. § 39–2–214(e) (Michie Repl.1994). We

agree with the Department that the Board's decision is contrary to law.

In *Kunard*, 869 P.2d at 134, we recognized that when a taxpayer excludes required elements from its reported production, and the exclusion causes an underpayment, the tax is delinquent upon the taxpayer's failure to pay on the date due, not at the later date when the taxpayer is presented with notice and demand of the deficiency. However, we held that Enron Oil and Gas Company properly offset credits and underpayment for different properties *in a given year*, "[b]ecause Enron's overpayments exceeded its underpayments for each of the tax years in question" and, therefore, "the County was never deprived use of the underpayment dollars. Thus, it would be inequitable to allow the County to charge interest on the underpayment, particularly since the County has had free use of the overpayment dollars." *Id.* at 136.

■ In the present case, however, it is undisputed that there were several given years when Amoco's tax payment was deficient. Thus, the reasoning in *Kunard* does not apply here. Neither can Amoco rely on Wyo. Stat. Ann. § 39-2-214(e), effective March 11, 1991. This statute provides:

> (e) The taxpayer is entitled to receive an offsetting credit for any overpaid gross product or severance tax identified by an audit that is within the scope of the audit period, without regard to the limitation period for requesting refunds. In calculating interest and penalty, the department or board of county commissioners shall first compute a net deficiency amount after subtracting any offsetting credit and then calculate any interest and penalty due.

Offsets or refunds pursuant to Wyo. Stat. Ann. § 39-2-214(e) are not applicable to audits commenced before the effective date of the statute. *Thunder Basin Coal Co. v. Wyoming State Bd. of Equalization*, 896 P.2d 1336, 1341 (Wyo.1995) (ad valorem taxes); *Texaco, Inc. v. State Bd. of Equalization*, 845 P.2d 398, 402 (Wyo.1993). Because the audits in this case commenced prior to the operation of Wyo. Stat. Ann. § 39-2-214(e), the Board erred in allowing Amoco to offset

credits and overpayments during the entire audit period.

## C. THE DEPARTMENT'S STANDING TO SEEK REVIEW OF PAYMENT FOR AD VALOREM TAXES

■ The right to review an administrative action is entirely statutory. *Amax Coal Co.*, 819 P.2d at 833. Uinta County appealed the Board's decision requiring partial payments of ad valorem taxes to be applied to the principal if so designated by the taxpayer. That appeal was dismissed, however, because Uinta County is not a "person" under Wyo. Stat. Ann. §§ 39-1-306 and 39-1-101(a)(xi), and, therefore, it has no statutory right to appeal the Board's decision.

The Department argues that in Uinta County's absence, it has standing to present this issue for our review. As the only taxing entity having standing to raise an error on appeal, the Department asserts it should have standing to challenge the Board's precedent regarding the application of partial payments to the gross value assessment made by the Department. In support of its position, the Department cites to *Amax Coal Co.*, 819 P.2d at 831 (*quoting Washakie County School Dist. No. One v. Herschler*, 606 P.2d 310, 317 (Wyo.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980)), where we stated:

> "Standing is a concept used to determine whether a party is sufficiently affected to insure that a justiciable controversy is presented to the court. * * * It is a necessary and useful tool to be used by courts in ferreting out those cases which ask the courts to render advisory opinions or decide an artificial or academic controversy without there being a palpable injury to be remedied. *However, it is not a rigid or dogmatic rule but one that must be applied with some view to realities as well as practicalities. Standing should not be construed narrowly or restrictively.*"

(Emphasis in original.)

The Department's reliance on *Amax Coal Co.* is misplaced. In *Amax Coal Co.*, the taxpayer challenged the Department's assessment as it related to both severance and ad valorem taxes. A portion of the Board's

order found in favor of the taxpayer, holding that the Department erred in refusing to allow a deduction for reclamation costs. On appeal, Amax Coal Co. challenged the Department's standing to appeal the Board's decision regarding reclamation costs.

Noting that standing " 'is a concept used to determine whether a party is sufficiently affected to insure that a justiciable controversy is presented to the court,' " we found the Department's appeal appropriate because:

> The allocation of reclamation costs to non-mining activities and the Board's allowance of a deduction from the *taxable value* of the coal provide a direct and significant negative impact on the amount of ad valorem and severance taxes collected by the State.

*Amax Coal Co.*, 819 P.2d at 831–32 (emphasis added). Unlike *Amax Coal Co.*, the dispute between Uinta County and the Board does not involve taxable value. The Board's decision relating to the payment of ad valorem taxes does not reach any duty or obligation relegated to the Department. No partial payment was made as to severance taxes. Consequently, the Department will not be affected by a decision on this issue.

At best, the Department can only argue that it may be affected by the Board's ruling in the event someone designates partial payment of severance taxes in the future. "Although the question as postulated in this case may be properly before us in the future, to render an opinion here would be to issue an advisory opinion. This Court has said repeatedly that it will not issue advisory opinions, and we decline to do so now." *State Bd. of Equalization v. Jackson Hole Ski Corp.*, 745 P.2d 58, 59 (Wyo.1987) (*citing Graham v. Wyoming Peace Officer Standards and Training Com'n*, 737 P.2d 1060 (Wyo.1987)); *see also Willowbrook Ranch, Inc. v. Nugget Exploration, Inc.*, 896 P.2d 769, 772 (Wyo.1995).

## V.  CONCLUSION

We affirm the Board's determination that the Department failed to use proper appraisal techniques in the valuation of Amoco's production. The Board's application of Wyo. Stat. Ann. § 39–2–214(e) to allow offsetting credits during the audit period is reversed. Finally, we find the Department lacks standing to raise the issue of the application of partial ad valorem tax payments, and, therefore, we do not address that issue here.

THOMAS, Justice, concurring and dissenting.

I agree completely with those aspects of the majority opinion, which affirm the Board of Equalization's treatment of the appraisal techniques, and hold that the Department of Revenue has no standing to present an issue on behalf of Uinta County in this case. I have a different view with respect to the reversal of the Board's decision that permitted offset of overpayments against underpayments, and I would affirm the Board's decision in that regard also. For that reason, I must dissent from that part of the majority decision.

I am satisfied that the "inequity" alluded to by this Court in the last sentence of *Texaco, Inc. v. State Bd. of Equalization*, 845 P.2d 398, 402 (Wyo.1993), has come to pass. If we follow strictly the statutory construction applied in that case, then basic concepts of equity and fair play must be invoked to accomplish justice in this case. The essence of the case is that Amoco Production Company endeavored to file amended returns for some of the tax years in issue, but those amended returns were held in abeyance by the audit process. Amoco Production Company was unable to file the appropriate claims for refund based upon those amended returns. Now the taxpayer is advised that it is too late to make a claim for a refund.

Neither in *Thunder Basin Coal Co. v. Wyoming State Bd. of Equalization*, 896 P.2d 1336 (Wyo.1995) nor in *Texaco, Inc.* did this Court negate the proposition that we had advanced previously:

> When a taxpayer has been wrongfully deprived of a hearing to which he is entitled, it can hardly be said that during that time he had that fair and full and unembarrassed opportunity to pay to which he is entitled. In such case the wrong is not one-sided, and the state should not be able to profit by its own wrong. Equitable

considerations will not be entirely disregarded even in tax cases. *United States Trust Co. v. New Mexico* [183 U.S. 535, 22 S.Ct. 172, 46 L.Ed. 315 (1902) ], supra.

*Morrison–Knudson Co. v. State Bd. of Equalization,* 58 Wyo. 500, 532, 135 P.2d 927, 939 (1943). We reiterated that proposition in *Kunard v. Enron Oil & Gas Co.,* 869 P.2d 132, 136 (Wyo.1994):

> Finally, this court has held that "[e]quitable considerations will not be entirely disregarded even in tax cases." *Morrison–Knudson Co. v. State Bd. of Equalization,* 58 Wyo. 500, 135 P.2d 927, 939 (1943). Because Enron's overpayments exceeded its underpayments for each of the tax years in question, the County was never deprived [of the] use of the underpayment dollars.

While Amoco Production Company was not denied a hearing, it was denied the opportunity to claim a refund by virtue of the audit process carried on by the taxing authorities. That difference does not serve to distinguish the equitable principle articulated in the prior cases, which should be applied here. Neither is there any apparent indication that Amoco Production Company will have an opportunity to present its claims because of audits commenced later as this Court suggested Texaco would have in *Texaco, Inc.* Further, there does not appear to be any opportunity for Amoco Production Company to profit from deliberate underreporting such as was assumed in the discussion of policy considerations in *Moncrief v. Wyoming State Bd. of Equalization,* 856 P.2d 440, 445 (Wyo. 1993). In fact, this case appears to fit somewhere in between *Moncrief* and *Kunard,* and there certainly is no reason to deny Amoco Production Company the opportunity to recover those overpayments it sought to address in its amended returns, which were not processed while the audit process was completed. Obviously, this is the result the Board sought to achieve, but the majority has ruled that it did not properly apply the pertinent statute. Perhaps the Board has no authority to invoke equitable relief for taxpayers, but this Court can afford equitable relief, and we should do that in this case.

I would affirm the Board of Equalization in all respects.