2008 WY 60

**WYOMING BOARD OF LAND COMMISSIONERS,** Appellant (Plaintiff),

v.

**ANTELOPE COAL COMPANY,** a Wyoming Corporation, Appellee (Defendant).

No. S–07–0183.

Supreme Court of Wyoming.

June 3, 2008.

Representing Appellant: Bruce A. Salzburg, Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General; Susan Kay Stipe, Senior Assistant Attorney General; Brandi Lee Monger, Assistant

Attorney General. Argument by Ms. Monger.

Representing Appellee: Patrick Reed Day, Holland & Hart, LLP, Cheyenne, Wyoming; Hadassah Marie Reimer, Holland & Hart, LLP, Jackson, Wyoming. Argument by Mr. Day.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1] The Wyoming Board of Land Commissioners asserted that Antelope Coal Company underpaid the royalties it owed the State of Wyoming pursuant to two coal leases. The Board filed suit against Antelope for breach of contract and declaratory judgment. The district court granted summary judgment to Antelope, and the Board appealed. We will affirm.

### ISSUE

[¶ 2] The Board presents this issue for review: Did the district court properly interpret the provisions of the state coal leases between Antelope Coal Company and the Board of Land Commissioners as those provisions related to non-arms length sales?

### FACTS

[¶ 3] Antelope is a coal producer in Wyoming's Powder River Basin. Some of the coal it mines is owned by the State of Wyoming, and leased for mining by Antelope. The two coal leases at issue in this case contain identical royalty provisions:

> Royalty shall be payable on the gross value at the mine on all coal mined. Gross value for the purpose of royalty calculation means the unit sale or contract price times the number of units sold. In calculating gross value the sales price shall be prima facie evidence of such gross value. No deduction shall be allowed for fees, taxes, assessments or similar levies imposed by the State of Wyoming, its political subdivisions, any other state or the federal government, nor for the expense of mining,

processing and loading the coal in merchantable condition at the mine ready for shipment. If the coal is not sold and valued at the mine, transportation from the mine to the point of sale or delivery may be deducted in determining value. In the event there is no sale of the coal or the Board of Land Commissioners determines that the sales price does not truly reflect the value of the coal, it may make its own determination of value and require that royalties be paid on the basis of the value determined by the Board.

[¶ 4] Antelope sells most of its coal in arms length transactions with unaffiliated companies. A small portion of its coal, however, is sold to an affiliated company, Venture Fuels,[1] pursuant to a 1991 Coal Supply Agreement. The Coal Supply Agreement between Antelope and Venture Fuels has been supplemented by agreements that, according to Antelope, adjusted the price to reflect current market prices in comparable arms length transactions.

[¶ 5] In 2004, the Wyoming Department of Audit conducted an audit of Antelope's royalty payments for coal produced from May 1994 through December 2000. The Department concluded that the sales of coal from Antelope to Venture Fuels were not arms length transactions because Antelope and Venture Fuels are affiliated companies. Asserting that sales between affiliated companies are "inherently suspect," the Department concluded that the actual sales prices between Antelope and Venture Fuels "did not truly reflect the value of the State's coal." Accordingly, the Department refused to accept the actual sales prices as the basis for calculating the royalties due under the leases.

[¶ 6] The Board adopted the Department's conclusion, and recomputed the royalties based on a net-back methodology. In simplified terms, this net-back methodology began with the sales price Venture Fuels received when it sold the coal to unrelated third parties in Michigan, and subtracted the costs Venture Fuels incurred to transport the coal from the mine to Michigan. The

---

1. Antelope is a wholly owned subsidiary of NERCO Coal Corporation. Venture Fuels is a partnership between NERCO Coal Sales Company and Midwest Energy Resources Company.

result was used as the basis of calculating royalties. Using its net-back methodology, the Board concluded that Antelope had underpaid royalties by a significant amount, and demanded payment. Antelope refused to pay the additional royalties, asserting that its sales to Venture Fuels did, in fact, reflect the fair market value of coal sold at the mine, and objecting to the Department's net-back methodology. The State filed this lawsuit against Antelope, claiming breach of contract, and seeking a declaratory judgment interpreting the state leases. On cross-motions for summary judgment, the district court ruled in favor of Antelope. The Board has appealed.

## STANDARD OF REVIEW

[¶ 7] We employ a familiar standard of review in considering the district court's grant of summary judgment against the Board and in favor of Antelope:

> We examine *de novo* the record, in the light most favorable to the party opposing the motion, affording to that party the benefit of all favorable inferences that may be drawn from the record. If upon review of the record, doubt exists about the presence of issues of material fact, that doubt must be resolved against the party seeking summary judgment. We accord no deference to the district court's decisions on issues of law.

*Linton v. E.C. Cates Agency, Inc.*, 2005 WY 63, ¶ 7, 113 P.3d 26, 28 (Wyo.2005) (internal citations omitted).

## DISCUSSION

[¶ 8] It is well established that a mineral lease is a contract, and is interpreted and construed pursuant to the general principles of contract interpretation. *Wolff v. Belco Dev. Corp.*, 736 P.2d 730, 732 (Wyo.1987); *State v. Moncrief*, 720 P.2d 470, 473 (Wyo. 1986). Employing settled rules of contract interpretation, we begin with the language of the contract.

> [T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America*, 864 P.2d 1018, 1023 (Wyo.1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co. [v. Texaco ]*, 882 P.2d [212,] 220 [ (Wyo.1994) ]; *Prudential Preferred Properties [v. J and J Ventures ]*, 859 P.2d [1267,] 1271 [ (Wyo.1993) ]. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535, 539 (Wyo.1996).

*Amoco Prod. Co. v. EM Nominee P'ship Co.*, 2 P.3d 534, 540 (Wyo.2000).

[¶ 9] We focus on the language of the royalty provisions. For convenience, we repeat the relevant language here:

> Royalty shall be payable on the gross value at the mine on all coal mined. Gross value for the purpose of royalty calculation means the unit sale or contract price times the number of units sold. In calculating gross value the sales price shall be prima facie evidence of such gross value.... If the coal is not sold and valued at the mine, transportation from the mine to the point of sale or delivery may be deducted in determining value. In the event there is no sale of the coal or the Board of Land Commissioners determines that the sales price does not truly reflect the value of the coal, it may make its own determination of value and require that royalties be paid on the basis of the value determined by the Board.

As demonstrated in the following paragraphs, we agree with the parties that this language is clear and unambiguous. We therefore interpret the royalty provisions and apply them to the facts of this case.

[¶ 10] The first sentence establishes the basic requirement that the royalty shall be payable on the gross value at the mine. The term "gross value" is essentially equivalent to the more familiar term "fair market value." *See Wyodak Res. Dev. Corp. v. Wyoming Dept. of Revenue*, 2002 WY 181, ¶ 33,

60 P.3d 129, 142 (Wyo.2002).[2] We will use the terms synonymously in this decision.

[¶ 11] The second sentence provides that gross value is based on sales or contract prices. In this case, the sales prices were the actual prices Antelope received for the coal it sold to Venture Fuels. According to the Wyoming Uniform Commercial Code,[3] a sale "consists in the passing of title from the seller to the buyer for a price." Wyo. Stat. Ann. § 34.1–2–106(a) (LexisNexis 2007). It is undisputed that title for the coal passed from Antelope to Venture Fuels, and that Venture Fuels paid Antelope a price. The fact that Antelope and Venture Fuels are affiliated companies does not mean that there were no sales. An interpretation limiting the term sales to arms length transactions between unaffiliated parties would be contrary to the plain and ordinary meaning of the word sale, and to the language of the coal leases.

[¶ 12] The next sentence provides that the sales price is *prima facie* evidence of gross value. *Prima facie* means "[s]uch evidence as . . . is sufficient to establish a given fact, or the group or chain of facts . . . and which if not rebutted or contradicted, will remain sufficient." *Kruzich v. Martin–Harris Gallery*, 2006 WY 7, ¶ 16, 126 P.3d 867, 874 (Wyo.2006) (emphasis omitted). There were sales between Antelope and Venture Fuels. Those sales prices provide *prima facie* evidence of gross value, and unless rebutted or contradicted, that is sufficient to establish gross value and to calculate royalties.

[¶ 13] The next sentence indicates that, if the coal is not sold at the mine, then transportation from the mine to the point of sale or delivery may be deducted in determining value. The Board deducted transportation costs from the point of sale in Michigan in applying its net-back methodology to calculate the royalty. Under this lease provision, however, transportation costs are deducted only if the coal is not sold at the mine. Antelope sold the coal to Venture Fuels at the mine. The Board's use of a net-back methodology to calculate royalties was not authorized under this particular sentence.

[¶ 14] The final sentence indicates two circumstances in which the Board may make its own determination of value. The first is when there is no sale of the coal. That is inapplicable here, because there were sales from Antelope to Venture Fuels. The second circumstance is when the Board "determines that the sales price does not truly reflect the value of the coal." The Board argues strenuously that this language gives it sole discretion to determine that the actual sales price did not reflect fair market value. Given the language of the lease, we do not disagree. When exercising that discretion, however, the Board still must abide by the terms of the leases. The leases provide that the actual sales prices are *prima facie* evidence of fair market value. Unless that evidence is rebutted or contradicted, there is simply no basis other than actual sales prices for determining fair market value and calculating royalties.

[¶ 15] The Board asserted in the district court that, to determine that sales prices between Antelope and Venture Fuels did not truly reflect the value of the coal, it did not need to compare those sales prices with prices of comparable sales Antelope made to other non-related parties, with prices of comparable sales from other mines, or with any other measurement of the coal market. Instead, as the district court wrote in its decision letter, "counsel for the Board stipulated

---

**2.** We recognize that *Wyodak* involved valuation for purposes of calculating ad valorem and severance taxes, not royalties. However, any differences in the valuation of minerals for purposes of assessing taxes or for purposes of calculating royalties are not at issue in this case. We are satisfied that the terms "gross value" and "fair market value" are equivalent for the purposes of this case.

**3.** The Wyoming Uniform Commercial Code applies to "transactions in goods." Wyo. Stat. Ann.

§ 34.1–2–102. After it is severed from the mineral estate, extracted coal is a "good" within the meaning of the Wyoming Uniform Commercial Code. *See* Wyo. Stat. Ann. § 34.1–2–105(a); *Central Illinois Light Co. v. Consolidation Coal Co.*, 235 F.Supp.2d 916, 918 (C.D.Ill.2002) (applying Illinois Uniform Commercial Code); *United States v. Rapoca Energy Co.*, 751 F.Supp. 565, 568 (W.D.Va.1990) (applying Virginia Uniform Commercial Code). The Uniform Commercial Code definition of "sale" therefore applies here.

that the Board *assumed* that the sale to Venture [Fuels] did not reflect fair market value since the sale was to a related entity." (Emphasis in original.) Because it was relying on this legal argument, the Board chose not to present the district court with evidence of any kind demonstrating that the sales prices between Antelope and Venture Fuels did, in fact, differ from the fair market value of the coal.

[¶ 16] In oral argument before this Court, the Board suggested that its net-back methodology provided evidence that Antelope's sales to Venture Fuels did not truly reflect the value of the coal. This evidence, the Board asserted, effectively rebutted or contradicted the *prima facie* evidence of the actual sales prices, and further, raised a genuine issue of material fact that precluded summary judgment in Antelope's favor. It is true that the net-back methodology is a recognized appraisal technique that, under proper circumstances, may yield evidence of fair market value. *See Thunder Basin Coal Co. v. Wyoming State Board of Equalization,* 896 P.2d 1336, 1338–39 (Wyo.1995). But the record contains no indication that the Board asked the district court to consider this argument, and we have repeatedly stated that we will not consider issues that are raised for the first time on appeal. *E.g., Yates v. Yates,* 2003 WY 161, ¶ 13, 81 P.3d 184, 188 (Wyo. 2003).

[¶ 17] Even if we were to consider the Board's new argument, we would conclude that the Board's net-back methodology did not provide sufficient evidence to raise a genuine issue of material fact. The net-back methodology used by the Board was based on the sales prices obtained by Venture Fuels in its sales to third parties in Michigan, with deductions for the costs of transporting the coal from the mine to Michigan. But Venture Fuels did more than just transport Antelope coal from the mine to the point of sale in Michigan. For example, Venture Fuels blended Antelope coal with coal from other mines. The resulting blended coal had characteristics, chiefly energy value and sulfur content, that made it different from, and different in value from, the coal from either mine alone. It is undisputed that the net-

back methodology used by the Board did not take into account the value added by Venture Fuels when it blended the coal. Thus, while the net-back methodology used by the Board could reflect the fair market value of the blended coal, it did not reflect the fair market value of Antelope coal. The Board's net-back methodology, as used in this case, did not provide evidence that the sales prices between Antelope and Venture Fuels did not truly reflect the value of the coal.

[¶ 18] Antelope, in contrast, provided the district court with substantial evidence supporting its position that the sales between Antelope and Venture Fuels did reflect fair market value. This evidence included information about the prices Antelope received for sales of coal to unrelated third parties, and expert opinion that the sales from Antelope to Venture Fuels were at fair market value. To counter this evidence, the Board offered the district court only its assumption that non-arms length sales between affiliated companies cannot reflect fair market value.

[¶ 19] The Board's assumption is contrary to Wyoming law. In *Wyodak,* ¶ 34, 60 P.3d at 142, we recognized the possibility that sales between affiliated companies might not be at fair market value:

> When coal sales are not arms length transactions ... the potential exists that the sales price may not reflect the fair market value. Typically, one would presume the nonarms length sale price would tend to be lower and thereby more favorable to the preferred customer, such as a parent company, than the actual fair market value.

But while that possibility exists, we concluded in *Wyodak* that the sales prices between the affiliated companies did provide the proper basis of valuation. ¶ 43, 60 P.3d at 144. This makes it plain that prices between affiliated companies can, indeed, reflect fair market value. Even more to the point, in *Department of Revenue v. Amoco Production Co.,* 7 P.3d 35, 39 (Wyo.2000), we ruled that the Department was not entitled to "rely on an assumption that the price paid pursuant to a transaction between related parties ***cannot*** be considered the fair market value of the product." (Emphasis in original.) The Department was required to determine fair

market value based on actual evidence of fair market value, not on the presumption that sales between affiliate companies did not reflect fair market value.

Given this precedent, the Board was justified in questioning whether non-arms length sales between affiliated companies reflected fair market value. It was not justified in assuming that such sales could never reflect fair market value. The parties agreed in the coal leases that the sales price between Antelope and Venture Fuels was *prima facie* evidence of gross value. The Board could not rebut or contradict that *prima facie* evidence with an unsupported assumption that sales between affiliates do not reflect fair market value. It had to base its assumption, and it had to rebut or contradict the *prima facie* evidence, with some actual evidence that the sales prices did not truly reflect the value of the coal. Absent rebuttal or contradiction, that *prima facie* evidence was sufficient for determining gross value and calculating royalties.

[¶ 21] The information before the district court, as it considered the parties' cross motions for summary judgment, can be divided into three categories. First, the district court had the actual sales prices between Antelope and Venture Fuels, which under the terms of the coal leases, was *prima facie* evidence of gross value. Second, it had evidence from Antelope supporting its position that the sales prices between Antelope and Venture Fuels reflected fair market value. Third, it had the Board's unsupported assumption that sales between Antelope and Venture Fuels did not truly reflect the value of the coal because they were not arms length transactions between unrelated parties. Given this information, the district court correctly ruled that there were no genuine issues of material fact, and that Antelope was entitled to judgment as a matter of law. We affirm.