2009 WY 80

Rose VELASQUEZ, Mike Velasquez, Mary Velasquez and Ernestino Velasquez, Land Owners, Appellants (Plaintiffs),

v.

Larry CHAMBERLAIN and Noreen Chamberlain, Husband and Wife, Appellees (Defendants).

Larry Chamberlain and Noreen Chamberlain, Husband and Wife, Appellants (Plaintiffs),

v.

Rose Velasquez, Mike Velasquez, Mary Velasquez and Ernestino Velasquez, Land Owners, Appellees (Defendants).

Nos. S–08–0043, S–08–0044.

Supreme Court of Wyoming.

June 18, 2009.

Representing Rose Velasquez, Mike Velasquez, Mary Velasquez, and Ernestino Velasquez: Patrick Dixon of Casper, Wyoming.

Representing Larry Chamberlain and Noreen Chamberlain: Heather A. Jacobson of Jacobson Law Office, LLC, Douglas, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1] These two consolidated appeals arise from a dispute between neighboring landowners. The Chamberlains own certain water rights. Traditionally, the water had been carried to their property through an established ditch running through property currently owned by the Velasquezes. Prior to the Velasquezes' purchase of the property, the ditch failed, and the Chamberlains replaced it with a pipeline, running on a different course from the ditch. When the Velasquezes bought the property, they claimed the Chamberlains had not received proper permission to install or maintain the pipeline and proceeded to effectively destroy the pipeline as it ran through their property. The resulting legal action included multiple claims for damages on both sides and a petition for a restraining order against the Velasquezes allowing the Chamberlains to go on their property and fix the pipeline.

[¶ 2] The district court determined the Chamberlains legally had the unencumbered right to convey their water through the pipeline. In appeal No. S–08–0043, the Velasquezes appeal the district court's order allowing the Chamberlains to maintain and use the pipeline as it crosses their property, as well as the district court's refusal to grant them damages. In appeal No. S–08–0044, the Chamberlains appeal the amount they were granted in damages, alleging the evidence supported a larger amount. We affirm the district court in No. S–08–0043. We reverse the district court's determination of damages in No. S–08–0044.

## ISSUES

[¶ 3] In appeal No. S–08–0043, the Velasquezes state the issues as:

a. Was the District Court in error in concluding that the pipeline is legally in place and that Appellees are entitled to the same rights in the pipeline that they were entitled to in the Powell No. 1 Ditch; specifically:

1. Did Appellees comply with Wyoming law in changing the means of conveyance of their appropriation?

2. Was the Agreement by which the pipeline was legally installed legally enforceable?

b. Did Appellants fail to prove that they sustained damages as a result of multiple trespasses by Appellees?

[¶ 4] In appeal No. S–08–0044, the Chamberlains ask this Court to determine "whether the District Court erred in finding that Appellants' damages were limited to Four Thousand, Three Hundred Dollars ($4,300)?"

### FACTS

[¶ 5] The appellants, Rose, Mike, Mary, and Ernestino Velasquez, own certain ranch property. Mary and Ernestino Velasquez are the parents of Mike and Rose Velasquez. Of the four, only Rose Velasquez resides on the property.

[¶ 6] The appellees, Larry and Noreen Chamberlain, own neighboring property on which they run farming and ranching operations. Larry generally manages the day-to-day operations.

[¶ 7] In 1999, Dave and Cindy Lozier (husband and wife) bought the property that is now owned by the Velasquezes under a contract for deed. In 2000, because Dave and Cindy Lozier were unable to meet their obligations under the contract for deed, the property was sold to Guy Lozier, Dave's brother. Guy never lived on the property. Rather, Dave and Cindy continued to live on and manage the property. Over the years, Dave and Larry entered into various agreements, including agreements allowing Larry to use portions of Guy's property such as a feed lot and stack yard.

[¶ 8] The Chamberlains own certain water rights from the LaPrele Creek. The water had traditionally been carried to the Chamberlains' property from the LaPrele Creek through the Powell Number One Ditch, which crosses the property now owned by the Velasquezes. A portion of the ditch failed, leaving the Chamberlains with little, if any, of the water to which they were legally entitled. Consequently, on February 28, 2005, Dave and Larry entered into a written agreement (the "Agreement") allowing Larry to lay a buried water pipeline across Guy's property for the transportation of water in exchange for Dave receiving water from the pipeline. Guy did not sign the Agreement.

[¶ 9] The pipeline was installed shortly after the Agreement, in March 2005. Guy was on the property after the pipeline went in and was able to observe the scar on the land left by the installation. Guy never said anything to Larry about the pipeline. Neither Guy nor Dave ever told Larry to remove the pipeline.

[¶ 10] Rose Velasquez is Cindy Lozier's sister. Dave and Cindy had allowed Rose to run some cows on the property while they lived there. As a result, Rose had lived on the property with Dave and Cindy for a couple of months each year during calving season. Rose also visited the property on weekends. While Rose did not see the pipeline going in, she was aware of the pipeline from her time spent on the property. When Dave and Cindy announced they were moving, Rose related her desire to buy the property. Since Dave had always run the place as if he owned it, Rose talked to him first. Dave referred Rose to Guy. This was the first time Rose became aware that Guy owned the property and not Dave and Cindy.

[¶ 11] The Velasquezes bought the property from Guy in November 2005. After the purchase, they never requested the Chamberlains remove the pipeline. They believed the Agreement was invalid, and therefore the pipeline was their personal property. In January 2006, alleging the pipeline leaked, they destroyed two separate sections of the pipeline as it crossed their property. They never informed Larry of their actions, either before, during or after. Thus began the instant litigation.

[¶ 12] Initially, the Chamberlains petitioned for a temporary restraining order and permanent injunction against the Velasquezes so they could go on the Velasquez property and repair the pipeline. The Chamberlains also sought damages in the amount necessary to repair the pipeline and for their hay crop losses due to the resulting

lack of irrigation. The Velasquezes answered and counterclaimed for a declaration that the Agreement was invalid and sought damages for various alleged trespasses including trespass caused by the existence of the pipeline, trespass for Larry using the feedlot, trespass by Larry driving through the feedlot area on his way to and from his hayfield; and alleged damages caused by leaks in the pipeline.[1]

[¶ 13] After a bench trial, the district court ruled generally in favor of the Chamberlains. The district court ruled the pipeline was legally in place on the Velasquez property and the Chamberlains had full rights in it. The district court additionally determined all claims for damages on both sides were speculative, being unsupported by the evidence presented. The lone exception was the claim by the Chamberlains for damages in the amount of the costs incurred in repairing the pipeline. As to this issue, the Chamberlains submitted a bill from the company that did the repairs in the amount of $11,540. Evidence presented at trial indicated the Chamberlains had paid only $4,300 at the time of trial. Larry testified he still owed the remainder of the amount to the company. The district court ruled the Chamberlains were only entitled to the $4,300 they had already paid. Both parties appealed.

### APPEAL NO. S–08–0043

### Discussion

#### Standard of Review

[¶ 14] As regularly stated:

This Court applies a clearly erroneous standard when reviewing findings of fact made by the district court after a bench trial. A finding is clearly erroneous when, even though substantial evidence supports it, the reviewing court is left with the definite and firm conviction that a mistake was made.

We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to the trial court's findings unless they are unsupported by the record or erroneous as a matter of law. Although the factual findings of a trial court are not entitled to the limited review afforded a jury verdict, the findings are presumptively correct.

This Court may examine all of the properly admissible evidence in the record, but we do not reweigh the evidence. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses. We accept the prevailing party's evidence as true and give to that evidence every favorable inference which may fairly and reasonably be drawn from it. Findings may not be set aside because we would have reached a different result.

*Snelling v. Roman*, 2007 WY 49, ¶¶ 7–8, 154 P.3d 341, 345 (Wyo.2007) (citations omitted). *See also Garrison v. CC Builders, Inc.*, 2008 WY 34, ¶ 22, 179 P.3d 867, 873–74 (Wyo.2008). We review legal conclusions de novo. *Campbell County School Dist. v. State*, 2008 WY 2, ¶ 10, 181 P.3d 43, 49 (Wyo.2008); *Mullinnix LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo.2006).

*Estate of Jedrzejewski ex rel. Severn v. Bierma*, 2008 WY 151, ¶ 9, 197 P.3d 1254, 1256 (Wyo.2008).

#### Statutory Compliance

[¶ 15] The Velasquezes' first argument is that the Chamberlains violated Wyo. Stat. Ann. § 41–3–114 in changing the flow of water from the established ditch to a pipeline. Section 41–3–114 reads:

**§ 41–3–114. Petition to change point of diversion or means of conveyance.**

(a) Any person entitled to the beneficial use of water, whether under a permit issued by the state engineer or a certificate of appropriation issued by the board of control pursuant to W.S. 41–4–511, who desires to change the point of diversion or means of conveyance, or both, shall file a petition with:

---

1. There was also a claim for reformation of deed, which was granted, and is not at issue in this appeal.

(i) The board of control if the use of the water has been adjudicated under a certificate of appropriation;

(ii) The state engineer in all other cases. The state engineer may consider a petition even if water has not been applied to beneficial use however, any change in point of diversion granted by the state engineer shall be in the vicinity of the original diversion, and provided:

(A) The change shall not alter the original project concept; and

(B) The water shall be diverted from the same source of supply described in the original permit.

(b) Petitions for change in point of diversion shall be in affidavit form and shall set forth the name and address of the petitioner, the name of the ditch, pipeline, or other facility, the stream from which water is appropriated, the date of priority and the amount of the appropriation to be changed, permit number, ownership of appropriation, and the location of the present and the proposed new point of diversion by course and distance from a corner of the public land survey. If for irrigation, petitions shall describe the acreage irrigated in each legal subdivision, the reason for the proposed change, and state whether any other appropriator from the same source will be injured in any way, and whether the consent of all owners of intervening diversions has been obtained. The petition shall be accompanied by satisfactory evidence of ownership of the appropriation to be changed.

(c) If the petition is for a change in point of diversion and means of conveyance for all or a part of an appropriation, it shall include, in addition to the foregoing, the name, permit number and date of priority of the ditch or facility to which it is to be changed, and whether the petitioner is the sole owner of both facilities involved or has the consent of the other owners of both ditches or facilities.

(d) Such petitions shall be accompanied by maps in duplicate, one (1) of which shall be on tracing linen of a size required by the state engineer and state board of control, prepared under certificate of a regis-tered land surveyor, and showing accurately the location of the stream, the location of the ditch or ditches involved, location of any intervening diversions, and if for irrigation, the location of the lands changed or affected by such change.

(e) In event that written consents of owners of appropriations which divert between the old and new points of diversion or the owners of ditches or facilities involved in the proposed change are not secured and attached to the petition, the petition shall be referred to:

(i) The superintendent of the water division in which the change is proposed, if the right is adjudicated; or

(ii) To the state engineer if the right is unadjudicated.

(f) The state engineer or the superintendent shall set a hearing on the petition and give thirty (30) days notice by registered mail of the time and place of the hearing to the petitioner and any owners of appropriations which divert between the old and new points of diversion and any owners or users of ditches or facilities to be affected by the proposed change. The petitioner shall provide the superintendent with a record of the proceedings which shall be transmitted to the state board of control with the superintendent's report. The state board of control or the state engineer may make such other regulations as may be found necessary. No petition shall be granted if the right of other appropriators will be injuriously affected. The attorney general shall represent the state board of control or the state engineer in any appeal.

(g) A decision by the state engineer granting or denying a petition under paragraph (a)(ii) of this section may be appealed to the board of control. An appeal may be taken to the district court pursuant to W.S. 16-3-101 through 16-3-115 from an order of the board of control:

(i) Affirming, modifying or reversing a decision of the state engineer appealed to the board under this subsection; or

(ii) Granting, modifying or denying a petition under paragraph (a)(i) of this section.

[¶ 16] We decline to address the argument. From the record designated to us by the parties, it is unclear whether the issue was raised at the trial below. During trial no questions were asked, nor evidence produced, directly on point. This Court has not been supplied with opening or closing trial statements from either side so we do not know if the subject was broached by either side during argument. Nothing in the district court's trial comments, decision letter, or final order indicate it considered the issue. Lacking any more conspicuous indication to the contrary, we consider the issue raised for the first time on appeal. Per our usual rule, we therefore will not consider it. *Wyoming Bd. of Land Comm'rs v. Antelope Coal Co.,* 2008 WY 60, ¶ 16, 185 P.3d 666, 670 (Wyo. 2008); *Yates v. Yates,* 2003 WY 161, ¶ 13, 81 P.3d 184, 188 (Wyo.2003).

[¶ 17] In addition, the argument on the issue presented by the Velasquezes in their brief is wholly inadequate. In their terse argument, they make no attempt at statutory analysis. Neither do they present any pertinent authority. They simply allege the statute applies to this situation, it was violated, and the violation results in the pipeline becoming their personal property. In other words, according to the Velasquezes, the Chamberlains have no legal right to ownership or even use of the pipeline because of what the Velasquezes claim to be a statutory violation. We will not undertake the Velasquezes' task of finding legal support for this fiat.

[¶ 18] Given the considerable doubt that exists as to whether the issue was adequately raised below and barring any legal analysis supporting the argument made by the Velasquezes, we find the issue not appropriately before us.

### Validity of the Contract

■ [¶ 19] The Velasquezes present several subarguments under this issue.[2] First, they question the validity of the Agreement in general. They question whether Dave was authorized to enter into the Agreement on behalf of Guy. The district court determined

that Dave had apparent authority to enter into the Agreement. Apparent authority exists when a principal has intentionally or inadvertently induced third persons to believe that such a person was his agent:

> Apparent authority is created when the principal holds the agent out as possessing the authority to bind the principal or when the principal allows the agent to claim such authority. *Id.* [*Ulen v. Knecttle,* 50 Wyo. 94, 103–04, 58 P.2d 446, 449 (1936)] To bind the principal under a theory of apparent authority, a third party must establish personal knowledge of, and reliance on, the apparent authority of the agent. *Id.* In *Herbert Const. Co. v. Continental Ins. Co.,* 931 F.2d 989, 993–94 (2nd Cir.1991), the Second Circuit Court of Appeals articulated that test:
>
> > To recover on this theory [apparent authority] the third party must establish two facts: (1) the principal "was responsible for the appearance of authority in the agent to conduct the transaction in question," *Ford,* [*v. Unity Hospital,*] 32 N.Y.2d [464,] at 473, 346 N.Y.S.2d [238] at 244, 299 N.E.2d [659] at 664 [ (1973) ] (citation omitted), and (2) the third party reasonably relied on the representations of the agent, *Hallock,* [*v. State,*] 64 N.Y.2d [224,] at 231, 485 N.Y.S.2d [510,] at 513, 474 N.E.2d [1178,] at 1181 [ (1984) ].
>
> This statement essentially modernizes our holding in *Ulen.* Apparent authority in agency cases will be determined according to this two-prong test.

*Cargill, Inc. v. Mountain Cement Co.,* 891 P.2d 57, 62–63 (Wyo.1995).

[¶ 20] Our first query, then, is whether Guy was responsible for the appearance of authority in Dave to enter into the Agreement. The evidence supports the district court's positive finding on this issue. Dave and Cindy initially owned the property. After Guy bought the property, Guy never lived there, but rather allowed Dave and Cindy to maintain their residence there. There was no change in the way Dave managed the

2. For instance, the Velasquezes claim the Agreement lacks consideration. This is belied by the

language of the Agreement, which provides in part that Dave could draw water as needed.

property. Dave's dealings with Larry did not change. Guy and Larry had periodic contact over the years but Guy never told Larry that Dave did not have authority to make decisions about the management and use of the property. Guy was on the property intermittently but never complained to Larry about anything. Given these facts, we cannot say it was clearly erroneous for the district court to conclude that Guy was responsible for giving Dave the appearance of authority to act as Guy's agent in making decisions concerning the property.[3]

[¶ 21] The second query is whether Larry's reliance on representations of Dave's authority in entering into the Agreement was reasonable. The Velasquezes argue Larry could not reasonably believe Dave had the authority to enter into the Agreement because Larry knew Guy was the legal owner of the property. The reasonableness in question, however, is whether Larry reasonably believed Dave had authority to act as an agent on behalf of Guy. For the same reasons stated immediately above, we agree with the district court that it was reasonable. According to the evidence, to the extent of Larry's knowledge, Dave managed the property without any input from Guy. The Agreement regarded a subject that fell directly in line with Dave's apparent authority. Again, under these facts, we cannot say it was clearly erroneous for the district court to conclude that it was reasonable for Larry to accept that Dave had authority to enter into the Agreement.

[¶ 22] Finally, the district court found that, even if Dave did not have apparent authority to bind Guy, Guy ratified the Agreement. Ratification is an agency concept that "retroactively creates the effects of actual authority." Restatement (Third) of Agency (ALI) § 4.02 (2006). According to Restatement (Third) of Agency (ALI) § 4.01 (2006):

(1) Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.

(2) A person ratifies an act by

(a) manifesting assent that the act shall affect the person's legal relations, or

(b) conduct that justifies a reasonable assumption that the person so consents.

In other words, ratification can be either express or implied.

[¶ 23] In this case, ratification is implied by Guy's silence in the face of knowledge of the pipeline. The Velasquezes argue there is no direct evidence of Guy's intent to ratify the Agreement because Guy did not testify. Direct evidence, however, is not necessary. In our appellate review we accept Larry's evidence as true and give to that evidence every favorable inference that may fairly and reasonably be drawn from it. The evidence supports a reasonable inference that Guy was aware of the pipeline as evidenced by a remaining scar on the ground from the excavation work. It also can be reasonably inferred that, by not objecting to Larry in any manner over a period of almost six months, Guy ratified the Agreement.

[¶ 24] The Velasquezes move on to challenge the validity of the Agreement as against them. They argue the Agreement does not constitute an easement, license, or covenant running with the land. It thus expired upon the sale of the property.

[¶ 25] The Velasquezes argument misses the mark. Under these circumstances, the focus, for analytical purposes, must be on the subject of the Agreement—the buried water pipeline. The pipeline replaces a portion of the Powell Number One Ditch, transporting the water appropriation of the Chamberlains to their property. This function is critical to our analysis because water rights encompass the right to convey water. "If a person has a right to convey water through a ditch, he owns an interest in that ditch or a share of the ditch to the extent of the water right he is entitled to convey through it." *Bard Ranch, Inc. v. Weber*, 538 P.2d 24, 34 (Wyo.1975). More simply, "the ditch follows the right." *Ren-*

---

**3.** Although not directly pertinent, it is telling that Rose, who ran cows on the property and stayed there for extended periods of time, was unaware of the fact that Dave and Cindy did not own the property.

*nard v. Vollmar*, 977 P.2d 1277, 1280 (Wyo. 1999). Although the language so far has been in terms of "ditch" rights, the rights apply to any means of transporting water:

> a water right becomes appurtenant to the land upon which the water is used, and the ditch, water pipe, or other conduit for the water becomes attached to the land, either as appurtenant or incident to the land, and necessary to its beneficial enjoyment, and therefore becomes part and parcel of the realty.

*Frank v. Hicks*, 4 Wyo. 502, 531, 35 P. 475, 484 (1894).

[¶ 26] Consequently, the ownership interest of the Chamberlains in the buried water pipeline remains unaltered regardless of who owns the property through which the pipeline runs. *See Bard Ranch*, 538 P.2d at 34 (property cannot be conveyed in derogation of rights of ditch owner). The only question might be whether the adjustment of the water flow from the Powell Number One Ditch to the pipeline in any way alters the rights of the Chamberlains. Our precedent convincingly answers this question in the negative. In *Bard Ranch*, water ran through a ditch known as the Cooley Ditch. The Cooley Ditch was relocated and lined with concrete. Subsequent owners of the land through which the modified Cooley Ditch ran claimed ownership of the ditch because of the alterations. The *Bard Ranch* Court held:

> The record in this case ... demonstrates that the rebuilding and concreting of the Cooley Ditch was done by mutual consent of the landowners involved. Under those circumstances the mere relocation of the right-of-way would not alter the rights of the respective owners. *Wallace Ranch Water Co. v. Foothill Ditch Co.*, 5 Cal.2d 103, 53 P.2d 929 (1935); *Babcock v. Gregg*, 55 Mont. 317, 178 P. 284 (1918). The new concrete ditch would be considered in the same light as the old earthen ditch, and the rights of the parties in it would be exactly the same.

*Bard Ranch*, 538 P.2d at 34. The Velasquezes make no attempt on appeal to distinguish *Bard Ranch*. We find it directly applicable to the facts of this case. We have already determined that the Agreement is valid and as such demonstrates mutual consent between the Chamberlains and Guy Lozier for the installation of the buried water pipeline. The Velasquezes thus have no right to interfere with the use of the pipeline by the Chamberlains.

## Damages

[¶ 27] The Velasquezes point to several instances of alleged trespass on the part of the Chamberlains. The district court held that no damages were proven. The district court's decision on the amount of damages to award involves a question of fact. *Carroll v. Bergen*, 2002 WY 166, ¶ 26, 57 P.3d 1209, 1217–18 (Wyo.2002). We review findings of fact after a bench trial under the clearly erroneous standard described above.

[¶ 28] One allegation of trespass is the very presence of the buried water pipeline. This allegation has been effectively disposed of by our ruling that the pipeline was legally in place. The Velasquezes also complain about the entrance of the Chamberlains onto their property to repair the pipeline without a court order. Again, the pipeline was legally in place, and the Chamberlains have the right to repair and maintain the pipeline as reasonably necessary.

[¶ 29] Another allegation of trespass was the use of the Velasquezes' feedlot by the Chamberlains. Larry did not dispute he used the feedlot, as he had in the past with Dave's permission. The record, however, supports the district court's finding that the amount of damages caused by this use of the feedlot by Larry was not adequately proven. The Velasquezes' only witness as to damages was Neil Hilsten. Mr. Hilsten is a ranch real estate broker and appraiser. He testified he based his valuation of damages on information supplied to him by the Velasquezes' attorney. He was told there were seventy-two head on the property for 2.75 months. He thus determined there were 198 animal unit months (AUMs). He then looked up the average grazing fee from the USDA Grazing Lease Report to come up with twenty dollars per AUM.

[¶ 30] The obvious initial problem is the lack of foundation for the damage assessment. Neither Larry nor Rose testified as to the number of head Larry had on the feedlot. There is no indication the attorney had first hand knowledge of the figures. The second problem is that an AUM is generally described as the amount of grazing it would take to support one cow/calf pair for one month. Mr. Hilsten had no information as to the age or weight of the cattle on the feedlot area. Taken together, we do not believe the evidence presented was sufficiently credible to justify overturning the district court.

[¶ 31] Yet another allegation of trespass concerned water flooding part of a pasture. The Velasquezes claim the water came from a leak in the water pipeline. The Chamberlains respond by pointing out the pipeline was brand new and they had no indication of a leak. There was testimony raising the possibility that the water was coming from a different neighbor. Most importantly, though, is again the insufficient proof of damages. The evidence on damages came once more from Mr. Hilsten. The basis for his opinion on damages came from a time when "the attorney and I went out and looked at [the pasture land] and he said that he thought Rose had told him it was 35 acres they were having problems haying." He made no independent evaluation of the claim. His damage assessment reflected the value of a total loss of hay on thirty-five acres.

[¶ 32] Rose testified thirty to thirty-five acres were affected. Crucially, however, she testified that neither she nor Dave before her ever used the pasture for haying. She did not use it at all and Dave had only used it for grazing. Rose never testified she wanted to use the property for hay production. Thus, even if a loss of use was occasioned by actions of the Chamberlains, a proposition already in doubt, the measure of damages presented bears no relation to any loss of use of the property. Our review reveals nothing suggesting that the district court's determination on this issue is clearly erroneous.

[¶ 33] Finally, the Velasquezes argue the Chamberlains conduct in general amounted to bullying and intimidation. The Velasquezes claim, as a consequence, even if they haven't proven damages for trespass, they still should be awarded at least nominal damages to deter such future conduct. They cite no Wyoming authority for this proposition. We also have no indication that this issue was raised below. We will not address it.

### Conclusion

[¶ 34] The Agreement was a valid contract between neighboring landowners to alter the course and method of water flowing from the LaPrele Creek to the Chamberlain property. The Chamberlains maintained the same ownership interest in the buried water pipeline as they had in the Powell Number One Ditch. Further, the damages claimed by the Velasquezes were not supported by adequate evidence. The district court's order is affirmed with regard to the challenges presented in this appeal.

### APPEAL NO. S-08-0044

### Discussion

[¶ 35] In this appeal, the Chamberlains question whether the district court erred when it awarded only $4,300 for repair costs to the pipeline. The district court's decision on the amount of damages to award involves a question of fact. *Carroll v. Bergen*, 2002 WY 166, ¶ 26, 57 P.3d 1209, 1217–18 (Wyo. 2002). We review findings of fact after a bench trial under the clearly erroneous standard described in our discussion in Appeal No. S-08-0043.

[¶ 36] The pertinent evidence includes an invoice in the amount of $11,540 for "[r]epair 12-inch Water line as per quote;" Larry's testimony that the invoice was for repair to the pipeline from damage caused by the Velasquezes; Larry's testimony that he has only paid $4,300 on the bill; and Larry's testimony that he still owes the remainder of the bill. There was no contradictory evidence.

[¶ 37] The only reason given by the district court for not allowing additional damages was that further damages had not been proven. We must disagree with this conclusion. Larry's testimony that he stilled owed the remainder of the money indicated on the invoice was never challenged. After reading

the entire record, we find no basis for any doubt as to the credibility of Larry's testimony on the issue. An award of the full amount of the invoice should have been granted.

### Conclusion

[¶ 38] The Chamberlains introduced adequate evidence to support their claim for damages in the amount of $11,540. The case is remanded with instructions to the district court to enter a new order reflecting the same.